## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-80021-CIV-ALTMAN/Reinhart

**KIMBERLY RIFE**, *et al.*,
*individually, and on behalf of all others*
*similarly situated*,

      *Plaintiffs*,

*v.*

**NEWELL BRANDS, INC.**, *et al.*,

      *Defendants*.

_____/

### <u>ORDER</u>

Since the 1970s, our Defendants—Newell Brands, Inc., and Sunbeam Products, Inc.—have sold electric slow cookers under the "Crock-pot" name. In recent years, though, the Defendants' competitors sought to out-compete them by introducing an electric *pressure* cooker, which allows for faster cooking. When demand for these pressure cookers skyrocketed, the Defendants invented a pressure cooker of their own.

The Defendants marketed their pressure cooker as a "TRUSTED" product and claimed that it "feature[d] a locking, air-tight lid that stays sealed under pressure for total peace-of-mind." But these promises, at least according to the Plaintiffs, were false. On the Plaintiffs' account, the Defendants' pressure cookers suffered from serious defects that caused them to explode during normal use, splashing unsuspecting customers with scorching hot food. The Plaintiffs in our case *either* purchased the Defendants' pressure cookers directly *or else* were burned while using them. And they've filed this lawsuit *both* as a putative class action (on behalf of similarly-situated purchasers around the country) *and* as an individual case (through which they seek redress for their personal injuries and property

damage). The Defendants, for their part, have moved to dismiss the now-operative Second Amended Complaint.[1] This Order follows.

## THE COMPLAINT[2]

### I.     The Advent of the Pressure Cooker

In 2010, a Canadian company called Instant Brands, Inc., "introduced an electric multi-cooker to the market[.]" Complaint" ¶ 43. The "Instant Pot," as it was called, "combined the benefits of [an] electric slow cooker with an electric *pressure* cooker function," *ibid.* (emphasis added), which "us[ed] steam under super-atmospheric pressure and at relatively high temperature to cook food quickly," *id.* ¶ 72. The Instant Pot "was met with widespread market acceptance, reportedly doubling its sales every year since 2012," *id.* ¶ 43, and it eventually became the "category leader in the emerging category [of pressure cookers]," *id.* ¶ 45.

In 2016, our Defendants "embarked on a campaign to compete in the electric pressure cooker market[ ] and take on the industry leader, Instant Pot." *Id.* ¶ 2. In April of that year, "Newell acquired Jarden Corporation, which owned Sunbeam." *Id.* ¶¶ 37–38. Newell "holds itself out as the makers of crock-pot brand products," *id.* ¶ 37 (cleaned up), and the Defendants historically "were involved in the design, sale, distribution and/or manufacture of other small appliance products under the Crock-Pot brand name," *id.* ¶ 42. So, "to avoid losing their footing amongst consumers looking for a convenient alternative to traditional cooking," *id.* ¶ 44, and—sensing an opportunity to leverage "a brand that has the trust and heritage that Crock-Pot has in consumers' homes," *id.* ¶ 45—the

---

[1] When we refer to "the Complaint," we mean the Plaintiffs' Second Amended Class Action Complaint [ECF No. 122].

[2] "We accept the factual allegations in [the complaint] as true and construe them in the light most favorable to the plaintiff." *Luke v. Gulley*, 975 F.3d 1140, 1143 (11th Cir. 2020) (quoting *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019)).

Defendants created an electric pressure cooker of their own: the 6-Quart Crock-Pot Express Pressure Cooker, *id.* at 1 (the "Pressure Cooker" or the "Product").[3]

The Defendants began selling the Pressure Cooker in July 2017, despite "initially plann[ing] for a 2018 launch[.]" *Id.* ¶ 44. They sold the Product "through third-party retailers and directly at https://www.crock-pot.com/." *Id.* ¶ 3 n.2. They "presented the Product as a time-saving solution and emphasized their ability to cook meals up to 70% faster than traditional cooking methods." *Id.* ¶ 46. "Further, to differentiate its Product from several competitors, who were beset with safety issues or recalls[,] including the premature release or explosion of pressure cooker lids, [the] Defendants touted the purported safety features of their Product." *Id.* ¶ 47. They labeled the Product as "'TRUSTED' because 'it features a locking, air-tight lid that stays sealed under pressure for total peace-of-mind.'" *Ibid.* Here's an example of that marketing (from the Product's packaging as it appears after purchase):

---

[3] For the sake of simplicity, we refer to the Pressure Cooker as a singular product—though we recognize that there are several models at issue in this case. *See* Complaint ¶ 25 ("The Products or Pressure Cookers at issue includes all Crock-Pot Express Pressure Cooker 6-Quart models manufactured up until October 15, 2018, and/or with date codes K196JN through K365JN, and/or with Model Numbers SCCPPC600-V1, SCCPPC600-V2, SCCPPC600-V1-DS, SCCPPC600-V1-BF, SCCPPC600V1122, SCCPPC600V1DIS, SCCPPC600V1DISM, SCCPPC600V1DIST, SCCPPC600V1DISW, SCCPPC600DSDIS, JC-SCCPPC600-V1, and JC-SCCPPC600-V1-DS.").



*Ibid.* The Defendants "also touted the Pressure Cooker's safety features on their own websites" as follows: "'Airtight locking lid stays locked until pressure is released for added safety (the lid must be in the locked position when pressure cooking).'" *Id.* ¶ 51 (quoting the Defendants' website). On the same website, the Defendants promised: "'Airtight locking lid remains locked while pressure is on inside the unit. The lid will only open when all the pressure has been released.'" *Ibid.* (quoting the website). And the Defendants reiterated these representations across their social-media sites, *id.* ¶ 52, on their third-party retailer websites, including Amazon.com and Walmart.com, *id.* ¶¶ 53–54, in their "Owner's Guide" (which came with the Product), *id.* ¶¶ 55; *see also* [ECF No. 122-1] (the "Owner's Guide"), and in the "recipe book included with the Product," *id.* ¶ 56. The Defendants specifically "intended for the reach of their Product to encompass gift buyers and gift recipients." *Id.* ¶ 153; *see also id.* ¶¶ 154–55.

Based on the Defendants' representations that the Pressure Cooker would function properly, the Plaintiffs began buying it just a few months after it became available. For example, a November 2017 advertisement prompted Plaintiff Kimberly Rife to ask her daughter, Plaintiff Nicolle Kainrath,

to buy the Product for her as a Christmas present, *see id.* ¶ 30—which Kainrath did, *see id.* ¶ 31.[4]

Plaintiff Lorrayne Casey bought the Pressure Cooker in November 2017 after seeing an ad for it on

Amazon. *See id.* ¶ 35. Between 2018 and 2019, Plaintiffs Kelly Naegele, Heather Brown, and Mitzi

Griffin all bought the Pressure Cooker, too.[5] *See id.* ¶¶ 33–35. In connection with their purchases, the

Plaintiffs all received the same "1 Year Limited Warranty," which read (in pertinent part) as follows:

> Sunbeam Products, Inc. doing business as Jarden Consumer Solutions or if in Canada,
> Sunbeam Corporation (Canada) Limited, doing business as Jarden Consumer
> Solutions (collectively "JCS") warrants that for a period of one year from the date of
> purchase, this product will be free from defects in material and workmanship. JCS, at
> its option, will repair or replace this product or any component of the product found
> to be defective during the warranty period. Replacement will be made with a new or
> remanufactured product or component. If the product is no longer available,
> replacement may be made with a similar product of equal or greater value. This is your
> exclusive warranty. Do NOT attempt to repair or adjust any electrical or mechanical
> functions on this product. Doing so will void this warranty. This warranty is valid for
> the original retail purchaser from the date of initial retail purchase and is not
> transferable. Keep the original sales receipt. Proof of purchase is required to obtain
> warranty performance. JCS dealers, service centers, or retail stores selling JCS products
> do not have the right to alter, modify or any way change the terms and conditions of
> this warranty. This warranty does not cover normal wear of parts or damage resulting
> from any of the following: negligent use or misuse of the product, use on improper
> voltage or current, use contrary to the operating instructions, disassembly, repair or
> alteration by anyone other than JCS or an authorized JCS service center. Further, the
> warranty does not cover: Acts of God, such as fire, flood, hurricanes and tornadoes.
>
> . . . .
>
> JCS shall not be liable for any incidental or consequential damages caused by the
> breach of any express, implied or statutory warranty or condition. Except to the extent
> prohibited by applicable law, any implied warranty or condition of merchantability or
> fitness for a particular purpose is limited in duration to the duration of the above
> warranty. JCS disclaims all other warranties, conditions or representations, express,
> implied, statutory or otherwise. JCS shall not be liable for any damages of any kind
> resulting from the purchase, use or misuse of, or inability to use the product including
> incidental, special, consequential or similar damages or loss of profits, or for any

---

[4] Former Plaintiff Mercedes Prado likewise bought the Pressure Cooker for her daughter (and former
Plaintiff), Sharling Prado. *See* Complaint ¶ 32. The Prados, however, have since dismissed their claims.
*See* Stipulation and Notice of Dismissal as to the Individual Claims of Mercedes Prado and Sharling
Prado [ECF No. 124].

[5] We'll refer to Kainrath, Casey, Naegele, Brown, and Griffin collectively as the "Purchasing
Plaintiffs."

breach of contract, fundamental or otherwise, or for any claim brought against purchaser by any other party. Some provinces, states or jurisdictions do not allow the exclusion or limitation of incidental or consequential damages or limitations on how long an implied warranty lasts, so the above limitations or exclusion may not apply to you. This warranty gives you specific legal rights, and you may also have other rights that vary from province to province, state to state or jurisdiction to jurisdiction.

Owner's Guide at 1 (the "Written Express Warranty").

## II.    The Defects

As we've hinted, though, the Pressure Cooker didn't function properly. On January 8, 2018, while using the Pressure Cooker to prepare dinner for her family, Rife removed the lid when, "[u]nbeknownst to her . . . the Pressure Cooker still retained a significant and dangerous amount of pressure inside the appliance." Complaint ¶ 127. When she "twisted and opened the lid, the scalding hot contents exploded out of the pot, spraying her hand, wrist and stomach, and her surrounding kitchen area." *Id.* ¶ 128. Similarly, on May 20, 2020, Griffin's daughter was using her mother's Pressure Cooker to cook chicken when, "[a]fter approximately 15 minutes of cooking, the lid blew off the base and the hot contents sprayed out of the pot," causing serious burns. *Id.* ¶ 137. And the Plaintiffs allege that "[d]ozens of other consumers reported similar horrific experiences[,] including at least 119 reported incidents acknowledged by Sunbeam to the [U.S. Consumer Product Safety Commission ("CPSC")], and other consumers who posted complaints online about the lid not remaining secure when pressurized and scalding hot contents erupting out of the pot." *Id.* ¶ 142; *see also id.* ¶¶ 143–49.

In the Plaintiffs' view, the Pressure Cooker suffers from *two* defects: the *first* allows "consumers to easily overcome the lid locking mechanism and remove the lid of the Pressure Cooker when pressure remains inside the unit (the 'Lid Lock Defect')"; the *second* permits "pressure to build within the pot when the lid is not securely attached to the base . . . (the 'Abnormal Close Defect')[.]" *Id.* ¶ 4.

With regard to the Lid Lock Defect, "one of [the] Defendants' major flaws was setting the torque (i.e., force) threshold to open the lid at too low of a level, at what [they] called a 'woman's strength,' rather than meeting the standard it promised to all consumers (regardless of gender or

individual strength), which was that the 'Lid cannot be opened until all the pressure is released.'" *Id.* ¶ 87 (quoting the Owner's Guide at 10–11); *see also id.* ¶ 7 ("Defendants' unreasonably low torque standard did not comply with UL's [Underwriters Laboratories] safety standard, UL 136, which required a minimum torque of 100 pounds to open the lid."). The Defendants also

> used defective and/or insufficient components and materials that did not prevent consumers from opening the lid while the Product and its contents were under pressure, which contradicted their safety representations and assurances to consumers. For example, the Product's lid locking mechanism contains an undersized (too short) locking pin that fails to keep the lid from opening while pressurized, and contains a lid locking bracket (also referred to as a 'strike plate'), which is supposed to work with the locking pin to secure the lid closed, but fails to do so because it is made of aluminum, an inadequate material which allows for too much flexibility to securely interlock with the short locking pin to keep the lid properly secured and closed while under pressure.

*Id.* ¶ 8; *see also id.* ¶ 91 ("Defendants were aware . . . that the locking pin, which is intended to secure the lid to the Product's 'middle pot,' must not be too short because that could prevent the lid from remaining secure when the contents remained pressurized and the consumer attempted to open the lid.").

> With respect to the Abnormal Close Defect, the Plaintiffs allege:

> Defendants created another defect which allowed pressure to build in the Product when the lid was not secure (i.e., in an abnormal position), creating a similar dangerous condition, causing the lid to erupt off the base and hot contents to spew out of the pot, and/or causing the contents to spew out of the pot when consumers made any effort to open the unsecured lid. This scenario occurred as a result of several design, manufacturing and/or material defects. The height of the magnet cover on the lid and the height of the outer rim (which provided a 'mating surface' with the magnet cover), were too narrow and insecure to prevent the unit from pressurizing if the lid was placed in an abnormal position other than locked. These particular design and material component defects comprise the Abnormal Close Defect within the Product.

*Id.* ¶ 11; *see also id.* ¶ 9 ("Defendants' flaws are worsened by the Product's insufficient middle pot tolerances, a component which is part of the Product's base on which the lid attaches, which together fail to ensure that the locking pin will secure the lid to the base when a consumer attempts to twist off the lid when pressure remains in the pot.").

### III.    The Defendants' Knowledge

The Plaintiffs allege that the Defendants *knew* about these defects—and, therefore, that they *knew* their representations about the Pressure Cooker weren't accurate. *See, e.g., id.* ¶ 5 ("Defendants were informed of several safety issues with pressure cookers during the design phase of the Product that Defendants failed to adequately address, resolve, and/or sufficiently warn consumers about before they began selling the Product in or about July 2017."). In support of this view, the Plaintiffs include the following timeline of key dates and events.

After a long investigation into the Pressure Cooker by the CPSC, "injuries caused by the Product were reported to [the] Defendants at least as early as December 26, 2017, just a few months after they started widely selling the Product[.]" *Id.* ¶ 12; *see also id.* ¶ 104 ("Defendants' defective Pressure Cookers were also the subject of a long investigation by the CPSC. Information gathered from that investigation reveals that dozens of consumers have been injured by Defendants' pressure cookers, and that injuries caused by the Product were reported to Defendants as early as January 2, 2018. Documents gathered from Exponent and complaints posted online indicate that numerous other consumers have experienced similar malfunctions with the Product and suffered damages and/or injuries beginning as early as December 26, 2017, just a few months after they started widely selling the Product.").

In February 2018, the Defendants "retained an engineering company, [Exponent, Inc.] . . . to conduct an investigation designed 'to replicate and identify the root cause of the pot boiling-over type incident' that injured consumers experienced." *Id.* ¶ 13. "As part of its investigative analysis, Exponent compared Defendants' product design with its competitor Instant Pot's design[ ] and determined Instant Pot's lid locking mechanisms were more effective to keep the lid locked when pressure remained in the pot and a consumer attempted to open the lid, and that Defendants' designs and materials were not adequate." *Ibid.* In its comparison testing, "Exponent could not open a pressurized

Instant Pot lid, but could open Defendants' pressurized lids, and concluded Defendants' lid locking mechanisms were a 'failure,' confirming the existence of the Lid Lock Defect." *Ibid.*; *see also id.* ¶¶ 92–99 (alleging that (1) Exponent issued a "root cause" report on February 27, 2018, identifying specific defects; (2) the Defendants conducted their own tests, which corroborated Exponent's findings; and (3) the Defendants instructed Exponent to stop its work after it generated its report).

"Beginning in or about February or March 2018, Defendants began making several safety design, manufacturing and material modifications to their Pressure Cooker's lid locking mechanisms to address the above-identified defects, including significantly increasing the minimum torque needed to open the lid to at least 150-200 [pounds], rather than the amorphous 'woman['s] strength' standard they previously implemented, which failed to even reach the UL minimum standard of 100 [pounds]." *Id.* ¶ 14. Those modifications included "lengthening the locking pin, changing the material of the strike plate (or lid bracket) from aluminum to stainless steel, and tightening the middle pot tolerances for a tighter and secure fit when the lid is under pressure and to safeguard against consumers attempting to open the lid, thereby effectively trying to fix the causes of the Lid Lock Defect." *Ibid.*; *see also id.* ¶ 99 (including eight "priorities" the Defendants prepared in March 2018 and sought to address).

But "[t]he Product modifications Defendants made to address the Lid Lock Defect and Abnormal Close Defect did not occur until about July 2018 and October 2018, respectively, over one year after Defendants began selling their defective product." *Id.* ¶ 17.[6] Moreover, "[a]fter making these modifications . . . [the] Defendants did not publicly disclose the Lid Lock Defect or Abnormal Close Defect to consumers, nor did they disclose the changes made. Rather, Defendants waited for over two years, until November 24, 2020, to issue a partial recall, prior to which over 100 incidents of

---

[6] *See also id.* ¶ 100 (alleging that the Defendants implemented changes "into a modified Product that they began manufacturing and then selling on or about July 15, 2018"); *id.* ¶ 101 ("Approximately three months after addressing the Lid Lock Defect, Defendants implemented further changes to its Product in or about October 1, 2018, to address the Abnormal Close Defect.").

malfunctions and reported injuries were reported to Defendants. Many of the modifications were not disclosed in the recall, nor disclosed to customers who previously purchased the Product." *Id.* ¶ 18.

And (the Plaintiffs contend) the Defendants' recall and quick fixes were too little too late. The Defendants made modifications in three phases: "(a) Phase One was implemented on or about May 25, 2018 and included adding the label on the lid and inserting an additional instruction sheet with the packaging to notify consumers of the proper locking position of the lid; (b) Phase Two was implemented on or about July 15, 2018 and included lengthening the lid locking pin, changing the lid bracket to stainless steel, tightening the middle pot tolerances on the base and increasing the visibility of the bobber valve; and (c) Phase Three was implemented on or about October 1, 2018 and included extending the lid's magnet cover height and increasing the base's outer rim height." *Id.* ¶ 163. Even after the Phase Three changes, though, "numerous consumers were still experiencing malfunctions with Defendants' Product, as well as severe injuries." *Id.* ¶ 164. Plus, "during that almost three-year period before the recall, [the] Defendants never alerted the public to the dangers associated with their old design of pressure cookers, or offered consumers an opportunity to trade-in their old model, or obtain a new lid and base to replace the defective ones. Even so, the recall failed to address many of the known design and manufacturing defects, and falsely blamed consumers for misusing the Product and causing their incidents and injuries." *Id.* ¶ 165.

## IV. The Plaintiffs' claims

The Plaintiffs filed this lawsuit "individually and as a [putative] nationwide class action" under Fed. R. Civ. P. 23. *Id.* ¶ 201. The Plaintiffs also seek to represent the following statewide subclasses of people who *bought* a Pressure Cooker: Plaintiffs Rife and Kainrath on behalf of consumers from Illinois, *id.* ¶ 203; Plaintiff Griffin on behalf of consumers from Georgia, *id.* ¶ 204; Plaintiff Brown on behalf of consumers from Washington, *id.* ¶ 205; Plaintiff Casey on behalf of consumers from Florida,

10

*id.* ¶ 206; and Plaintiff Naegele on behalf of consumers from Michigan, *id.* ¶ 207. Altogether, the Plaintiffs bring nineteen claims:

i.    Breach of Express and Implied Warranties Under the Magnuson-Moss Warranty Act (on behalf of Plaintiffs and the Class) – Count I;

ii.   Breach of Express Warranty (on behalf of Plaintiffs and the Class) – Count II;

iii.  Breach of Implied Warranty of Merchantability (on behalf of Plaintiffs and the Class) – Count III;

iv.   Negligence (on behalf of Plaintiffs and the Class) – Count IV;

v.    Unjust Enrichment (on behalf of Plaintiffs and the Class) – Count V;

vi.   Strict Product Liability – Manufacturing and Design Defects and Failure to Warn (on behalf of Plaintiffs and the Class) – Count VI;

vii.  Florida Deceptive and Unfair Trade Practices Act (on behalf of Plaintiffs and the Class) – Count VII;

viii. Illinois Consumer Fraud and Deceptive Business Practices Act (on behalf of Plaintiffs and the Illinois Subclass) – Count VIII;

ix.   Violation of Georgia's Fair Business Practices Act ('GFBPA") (O.C.G.A. Sections 10-1-390 *et seq*.) (on behalf of the Georgia Subclass) – Count IX;

x.    Violation of the Washington Consumer Protection Act ("WCPA") (Wash. Rev. Code Ann. Sections 19.86.010, *et seq*.) (on behalf of the Washington Subclass) – Count X;

xi.   Violation of the Michigan Consumer Protection Act ("MCPA") (Mich. Comp. Laws, Sections 445.901, *et seq*.) (on behalf of the Michigan Subclass) – Count XI;

xii.  Injunctive and Declaratory Relief (on behalf of Plaintiffs and the Class) – Count XII;

xiii. Negligence (on behalf of Sharling Prado) – Count XIII;

xiv.  Negligence (on behalf of Kimberly Rife) – Count XIV;

xv.   Products/Strict Liability (on behalf of Sharling Prado) – Count XV;

xvi.   Products/Strict Liability (on behalf of Kimberly Rife) – Count XVI;

xvii.   Unjust Enrichment (on behalf of Plaintiffs and the Class) – Count XVII;

xviii.   Deceptive Acts or Practices, New York Gen. Bus Law § 349 (on behalf of Mercedes Prado) – Count XVIII; and

xix.   False Advertising, New York Gen. Bus. Law § 350 (on behalf of Mercedes Prado).

Complaint at 82–120.[7] As redress, the Plaintiffs ask for money damages and declaratory and injunctive relief. *See id.* at 121–22.

## THE MOTION TO DISMISS[8]

The Defendants have moved to dismiss the Complaint on two main grounds: for "lack of subject matter jurisdiction" under FED. R. CIV. P. 12(b)(1), and for "failure to state a claim upon which relief can be granted" under FED. R. CIV. P. 12(b)(6). We lack subject-matter jurisdiction over the Purchasing Plaintiffs' claims (the Defendants say) because those Plaintiffs "lack Article III constitutional standing." MTD at 5 (cleaned up). Specifically, the Defendants argue that the Purchasing Plaintiffs haven't suffered any "injury in fact" with respect to their "economic loss claims." *Ibid.* (cleaned up); *see also id.* at 5–7. The Defendants also contend that "[t]he SAC separately fails to establish standing for injunctive relief for any Plaintiff." *Id.* at 7; *see also id.* at 7–8. And they maintain

---

[7] Counts XII, XV, XVIII, and XIX are no longer extant because, as we've mentioned, the Prados dismissed their claims. *See supra* note 4. And, as we explain in the following section, the Defendants (rightly) do not challenge Counts XIV and XVI—Rife's *individual* claims for negligence and strict-product liability. Finally, the Defendants never attack the second of two unjust-enrichment counts (Count XVII).

[8] *See* Defendants Newell Brands Inc. and Sunbeam Products, Inc.'s Motion to Dismiss Plaintiffs' Second Amended Complaint Under FED. R. CIV. P. 12(b)(1) and 12(b)(6) and Incorporated Memorandum of Law [ECF No. 125] (the "MTD"). The MTD is fully briefed and ripe for adjudication. *See* Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint Under FED. R. CIV. P. 12(b)(1) and 12(b)(6) [ECF No. 129] (the "MTD Response"); Defendants Newell Brands Inc. and Sunbeam Products, Inc.'s Reply in Further Support of Motion to Dismiss Plaintiffs' Second Amended Complaint Under FED. R. CIV. P. 12(b)(1) and 12(b)(6) [ECF No. 131] (the "MTD Reply").

that the Plaintiffs have failed to state claims: (a) for breach of express warranty under Florida law (Count II); (b) for breach of implied warranty of merchantability under Florida law (Count III); (c) under the Magnusson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* ("MMWA") (Count I); (d) for negligence (Count IV) and strict-product liability (Count VI); (e) under any state statute (Counts VII–XI); and (f) for unjust enrichment (Count V).[9] We'll address these arguments in turn.

## THE LAW

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545).

On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243,

---

[9] Again, the Defendants never challenge the *second* unjust-enrichment count (Count XVII).

1246 (11th Cir. 2016). Unsupported factual allegations and legal conclusions, however, receive no such deference. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). A complaint's "well-pled allegations must 'nudge the claims across the line from conceivable to plausible.'" *Hays v. Page Perry, LLC*, 627 F. App'x 892, 896 (11th Cir. 2015) (cleaned up) (quoting *Twombly*, 550 U.S. at 555, 570).

## ANALYSIS

### I.      Standing

#### A.      Article III Standing for Monetary Damages

The Purchasing Plaintiffs—Kainrath, Griffin, Brown, Casey, and Naegele—have adequately alleged Article III standing for their money-damage claims. Our constitutional framework limits federal courts to deciding "Cases" or "Controversies." U.S. CONST. art III, § 2. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338. "A plaintiff at the pleading stage, as the party invoking federal jurisdiction, bears the burden of establishing these elements by alleging facts that plausibly demonstrate each element." *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1337 (11th Cir. 2021) (cleaned up).

The Defendants, as we've said, contest only the first element: whether the Purchasing Plaintiffs have suffered an injury in fact. *See* MTD at 5–7. "An injury in fact consists of 'an invasion of a legally protected interest' that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020) (cleaned up). An economic injury is the "epitome" of a concrete injury. *MSPA Claims 1, LLC v. Tenet*

14

*Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019); *see also Sierra Club v. Morton*, 405 U.S. 727, 733 (1972) ("[P]alpable economic injuries have long been recognized as sufficient to lay the basis for standing[.]"). "A person experiences an economic injury when, as a result of a deceptive act or an unfair practice, he is deprived of the benefit of his bargain." *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1084 (11th Cir. 2019). The idea is that such a person has suffered a monetary loss in the value of what she *actually paid* and what she *would have paid* if not for the deceptive act. *See Nuwer v. FCA US LLC*, 552 F. Supp. 3d 1344, 1354 (S.D. Fla. 2021) (Singhal, J.) (holding—where a putative class of car buyers claimed that a manufacturer sold and leased cars equipped with defective active head restraint ("AHR") systems in headrests—that the complaint's "allegations that the latent defect in the AHR deprived them of the benefit of the bargain meets the injury-in-fact requirement under Eleventh Circuit law" (citing *Debernardis*, 942 F.3d at 1076)).

That's exactly what the Purchasing Plaintiffs have alleged here. In particular, they've averred that the Defendants touted the Product's (purported) safety features, telling consumers (for instance) that the Pressure Cookers "feature[ ] a locking, air-tight lid that stays sealed under pressure for total peace-of-mind," and that the "[l]id cannot be opened until pressure is released." Complaint ¶¶ 50, 55. The Purchasing Plaintiffs have asserted, too, that they relied on these safety representations when they bought the Product. *See id.* ¶ 31 ("Ms. Kainrath reviewed the packaging of the Pressure Cooker prior to purchase and relied upon the representations thereon in making her decision to purchase the Pressure Cooker."); *see also id.* ¶¶ 33–36 (including the same allegations for Griffin, Brown, Casey, and Naegele). But "the Defects contained in the Product's lid and base made the foregoing representations false and misleading because the Product could not be safely used as Defendants represented." *Id.* ¶ 57. And the Plaintiffs allege that, because of this, they lost out on the benefit of their bargain. *See id.* ¶ 31 ("Plaintiff Kainrath would not have purchased the Product if she had known of the Defects or that the Product was unfit to perform its intended purpose, rendering the Product useless."); *see also id.* ¶¶

33–36 (including the same allegations for Griffin, Brown, Casey, and Naegele). They say, in other words, that they suffered "damages," including: (1) "the purchase price of the Pressure Cooker"; (2) "their failure to receive the benefit of their bargain"; (3) "their overpayment for the Pressure Cooker"; and (4) the diminished value of the Pressure Cooker." *Id.* ¶ 150.

Unsurprisingly, federal courts routinely hold that allegations like these—*viz.*, that, had they known about the defects, the plaintiffs would have paid less for their product—are enough to plausibly establish a concrete *injury*. Joining the majority in *Debernardis*, for instance, Judge Sutton (sitting by designation) explained:

> [The plaintiffs] nonetheless plausibly allege an injury in fact—that they paid more for [the defendant's] dietary supplements than they would have paid had they known the company did not follow the law. This difference in price states a concrete economic harm that satisfies Article III standing's injury in fact element, no matter the label we give it. Without the benefit of discovery, we are not in a position to second guess the harm they allege. And that suffices to permit the case to proceed.

*Debernardis*, 942 F.3d at 1090 (Sutton, J., concurring) (cleaned up); *see also id.* at 1084 (agreeing with Judge Sutton that a plaintiff demonstrates standing when "he is deprived of the benefit of his bargain"). And that's what happened here. The Plaintiffs thought they were buying a *safe* Pressure Cooker. Instead, they received a *dangerous* one—with an unexpected propensity for explosion. They paid more for the Pressure Cooker than they would have had they known the truth about the Product. That's enough at this stage of the case.

Indeed, courts around the country agree with the two basic points we reiterate here: (1) a plaintiff suffers an injury in fact when he buys a defective product, and (2) the plaintiff doesn't need to wait for his product to malfunction or explode before seeking relief in court. *See, e.g., Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007) (finding standing because, "although plaintiffs do not assert physical injuries (either their own or those of other persons), they do assert their own actual economic injuries," including "their actual economic harm (e.g., overpayment, loss in value, or loss of usefulness) emanating from the loss of their benefit of the bargain"); *In re Aqua Dots Prods. Liab. Litig.*,

654 F.3d 748, 751 (7th Cir. 2011) (finding that parents whose children were not injured by a toy had standing to sue because "they paid more for the toys than they would have, had they known of the risks the [toys] posed to children"); *In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d 1101, 1121 (S.D. Fla. 2019) (Moreno, J.) (concluding that the plaintiffs alleged an injury in fact where they "assert[ed] they suffered economic injuries and are entitled to damages comprising the value they overpaid for their vehicles based on misinformation about vehicle safety").

Unfazed by all this, the Defendants cite several inapposite or otherwise unpersuasive out-of-circuit district-court decisions. *See* MTD at 6. *First*, they point to *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152 (C.D. Cal. 2011) (Selna, J.), which held that, "[w]hen [an] economic loss is predicated solely on how a product functions, and the product has not malfunctioned, the Court agrees that something more is required than simply alleging an overpayment for a 'defective' product," *id.* at 1166 n.11. As an initial matter, it's not entirely clear *why* "something more" would be required: If a person alleges that she overpaid for a defective product—a product that's prone to blowing up—it's hard to see *what* "more" (short of an actual explosion) would be necessary to establish standing. Either way, even *In re Toyota* recognized that this "something more" could "be based on sufficiently detailed, non-conclusory allegations of the product defect." *Ibid.* And that's precisely what our Plaintiffs have done here: describe in painstaking detail the Lid Lock and Abnormal Close Defects they discovered in *all* of their Pressure Cookers. *See* Complaint ¶¶ 3–15, 72–125.[10]

---

[10] Courts have regularly distinguished *In re Toyota*'s language about "something more" on this basis (*i.e.*, that the plaintiffs had alleged the product defect in sufficient detail). Indeed, the very judge who authored *In re Toyota* distinguished a later set of facts on that very ground. *See Kaupelis v. Harbor Freight Tools USA, Inc.*, 2019 WL 6998661, at *4 (C.D. Cal. Oct. 9, 2019) (Selna, J.) (finding sufficient allegations of an injury in fact because the plaintiffs did "not simply allege that the product they purchased is defective, but rather offer[ed] detailed, non-conclusory factual allegations of the product defect" (cleaned up)); *see also, e.g., In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 2022 WL 522484, at *68 (C.D. Cal. Feb. 9, 2022) (Kronstadt, J.) (finding plaintiffs had standing because they offered "sufficiently detailed, non-conclusory allegations of the product defect" (cleaned up)); *Lewis v. Mercedes-*

*Second*, the Defendants rely on *Lassen v. Nissan North America, Inc.*, 211 F. Supp. 3d 1267 (C.D. Cal. 2016). But that case doesn't help them either. There, the owners of Nissan vehicles claimed that their "vehicles' lack of an auto-off feature constitutes a design defect that [Nissan] had a duty to disclose before sale." *Id.* at 1272. The plaintiffs alleged that "they experienced the alleged defect because they experienced their cars not automatically turning off after they inadvertently left them on"; that "they are concerned about the lack of Auto-Off in the vehicle"; that "other people have suffered carbon monoxide poisoning"; that "their injury in fact is that they would not have purchased or leased their vehicles, or would have paid less, had they known they lacked Auto-Off"; and that "their vehicles diminished in value." *Id.* at 1279 (cleaned up). The court held that those allegations were insufficient to establish standing. *Id.* at 1280. But the court added that "[i]njuries suffered by others *can* help establish a non-injured plaintiffs' claim that the defect diminished the value of his vehicle because widespread reports of the defect could decrease market demand for the vehicle," *ibid.*; the problem in that case (the court felt) was that the complaint "lack[ed] any allegation that [the p]laintiffs' vehicles declined in value *because* they lack[ed] Auto-Off." *Ibid.* (emphasis added). So, the court couldn't discern any "nexus between other people's physical injuries and [the p]laintiffs' claimed economic harm of having paid too much for their vehicles." *Ibid.* The court also recognized that "overpayment and diminution in value are theoretically cognizable injuries-in-fact." *Ibid.* (cleaned up). The plaintiffs had simply failed to support that theory with concrete allegations because they "did not purchase their vehicles based on any expectation that they included additional safety features." *Id.* at 1284. Instead, "[f]rom a consumer fraud perspective, [the plaintiffs] were entitled to expect that the

---

*Benz USA, LLC*, 530 F. Supp. 3d 1183, 1203 (S.D. Fla. 2021) (Ruiz, J.) (finding plaintiffs had standing because they "offer[ed] detailed, non-conclusory factual allegations of the product defect" (cleaned up)).

suite of features included with their vehicles would function as designed," and the complaint "reveal[ed] that that is what [the plaintiffs] received[.]" *Ibid.*

Our case, of course, is different. *For one thing*, the Purchasing Plaintiffs *have* alleged a direct link between the physical harms suffered by others (including Rife) and the economic losses they've endured. *See, e.g.*, Complaint ¶¶ 126–49 (detailing the experiences of Rife, Griffin's daughter, and other consumers of the malfunctioning Pressure Cookers); *see also id.* ¶ 150 ("As a result of Defendants' misconduct, Plaintiffs and members of the Class and the Subclasses have suffered damages, including, without limitation: (a) the purchase price of the Pressure Cooker, as Plaintiffs and members of the Class and the Subclasses would not have acquired or would have returned the product had they been informed of the Defects; (b) their failure to receive the benefit of their bargain; (c) their overpayment for the Pressure Cooker; (d) the diminished value of the Pressure Cooker; (e) the costs of repair or replacement of the Pressure Cooker; (f) the loss of use of the Product; (g) the lost warranty value of the Product; and (h) damages to real and/or personal property."). So, we have no trouble finding the necessary "nexus between other people's physical injuries and the Plaintiffs' claimed economic harm of having paid too much for their [Pressure Cookers.]" *Lassen*, 211 F. Supp. 3d at 1284 (cleaned up). *For another*, our Plaintiffs *have* alleged that they purchased the Pressure Cookers *based on the expectation* that they functioned safely and correctly. *See, e.g.*, Complaint ¶ 69 ("Plaintiffs and members of the Class and the Subclasses acquired their Pressure Cookers reasonably believing Defendants' representations that they were properly designed, manufactured and built with proper components, and free from defects, and safe for their intended, foreseeable use."). In short, *Lassen* cannot control us here.[11]

---

[11]     The Defendants' other cases aren't close. In one, the plaintiff complained of problems with his car brakes, but "updated software was installed in his vehicle," which fixed the issue—so the plaintiff plainly "received precisely what he bargained for." *In re Toyota Motor Corp. Hybrid Brake Mktg.,*

Because the Purchasing Plaintiffs have plausibly alleged that they suffered an injury in fact when—based on the Defendants' misrepresentations—they overpaid for their Pressure Cookers, they've established their Article III standing to seek monetary relief.

## B.     Article III Standing for Injunctive Relief

The Plaintiffs have failed, though, to plausibly allege standing to seek injunctive relief. "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017). "Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party shows a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury." *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1229 (11th Cir. 2021) (cleaned up). In other words, our Plaintiffs' "standing to seek the injunction[s] requested depend[s] on whether [they are] likely to suffer future injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

Applying these standards, "[s]everal . . . circuits have considered whether a previously [but no longer] deceived consumer has standing to seek injunctive relief and have held they do not." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 970 n.5 (9th Cir. 2018) (collecting cases); *see also, e.g., Conrad v.*

---

*Sales Pracs. & Prods. Liab. Litig.*, 915 F. Supp. 2d 1151, 1159 (C.D. Cal. 2013). The same can't be said of our Plaintiffs—principally because (they allege) the "Defendants failed to warn consumers who purchased the original or non-modified Product of the defects and safety problems, and instead unjustifiably delayed recalling the subject Pressure Cookers until November 24, 2020, more than two years later, and after more than 100 people were severely injured as a result of the defects." Complaint ¶ 102.

In another case, the court commented that "[a] plaintiff who purchases a digital camera that never malfunctions over its ordinary period of use cannot be said to have received less than what he bargained for when he made the purchase." *In re Canon Cameras*, 237 F.R.D. 357, 360 (S.D.N.Y. 2006). The court said this, however, not in discussing the plaintiff's Article III standing, but in considering the viability (on the merits) of an unjust-enrichment claim under New York law. *See id.* at 359–60 ("Likewise, to prevail on their unjust enrichment claims, plaintiffs will have to establish that the benefits [plaintiffs] received were less than what these purchasers bargained for." (cleaned up)). In any event, the law in *our* Circuit is clear that a plaintiff *has* sustained an injury in fact when "he is deprived of the benefit of his bargain," *Debernardis*, 942 F.3d at 1084, which is what the Plaintiffs have plausibly alleged here.

*Boiron, Inc.*, 869 F.3d 536, 539 (7th Cir. 2017) (finding that the plaintiff "lacked standing to pursue injunctive relief (a ban on marketing [a homeopathic product] as a flu remedy)" because the plaintiff was now "fully aware of the fact that [the product] is nothing but sugar water"—and so, was unlikely to "be duped by [the seller's] misleading claims again"); *Kommer v. Bayer Consumer Health*, 710 F. App'x 43, 44 (2d Cir. 2018) ("As [the plaintiff] concedes, now that he knows of [the] Defendants' alleged deception and false advertising, he is no longer likely to purchase [the product] ever again. Accordingly, he has no standing under Article III to enjoin the defendants' sales practices[.]" (cleaned up)).

These courts have reasoned that a consumer who's already aware that a product's labeling is misleading is unlikely to be deceived again in the future:

> The premise that former customers could again be deceived by the very sort of advertising practices over which they were already pursuing equitable relief was a premise unmoored from reality. [The plaintiff] has sued Johnson & Johnson for failing to warn her of certain health risks. To state the obvious, then, she is presently aware of those risks. . . . [W]e wonder how [the plaintiff] could possibly be deceived again into buying Baby Powder without being aware of those same risks. She is simply not at risk of suffering an economic "injury," and we will not give cognizance to this sort of "stop me before I buy again" claim.

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 292–93 (3d Cir. 2018).

Some courts have questioned this premise. As the Ninth Circuit has explained, "[k]nowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future." *Davidson*, 889 F.3d at 969; *see also, e.g.*, *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 194–95 (D.D.C. 2013) (finding a likelihood of future harm because the plaintiffs had "no way of knowing" whether the manufacturer "boost[ed] the label's veracity"). In other words, *these* courts have held that a plaintiff *could* plausibly allege "that she might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved." *Davidson*, 889 F.3d at 970. To plausibly allege standing on *this* theory, though, the plaintiff must at least "allege[ ] an[ ] intent to purchase [the] product in the

future." *Nunez v. Saks Inc.*, 771 F. App'x 401, 402 (9th Cir. 2019); *see also Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1088 (9th Cir. 2020) (same).

With these principles in mind, we turn to our case. The Plaintiffs seek an injunction (1) "issuing warnings and/or notices to consumers and the Class concerning the Defect"; (2) "immediately discontinuing the manufacture, production, marketing, distribution, and sale of the defective Pressure Cooker"; and (3) "issuing a nationwide recall of the Pressure Cooker." Complaint ¶ 381. But the Plaintiffs never explain how any of these forms of relief might alleviate a likelihood of future harm. *See generally ibid.* Here's what we mean. *First*, it's unclear what good some "warnings" and "notices" to *other* consumers would do for *our Plaintiffs*, who are (admittedly) already aware of the defects. Put differently, it's hard to see what injuries (if any) this injunctive relief would redress for our Plaintiffs. *Second*, we can't understand why "discontinuing the manufacture, production, marketing, distribution, and sale of the defective Pressure Cooker" would make any difference to the Plaintiffs, who (as we've established) already *know* that the Pressure Cooker is defective and will thus *never* purchase a Pressure Cooker again. In fact, some of the consumer complaints the Plaintiffs included in the Complaint expressed precisely this sentiment. *See id.* ¶ 148 (including an Amazon.com consumer complaint that said, in part, "[s]eriously disappointed in this product *and will never use again*" (emphasis added)). *Third*, while the Plaintiffs thoroughly explain why the Defendants' recall was inadequate, *see id.* ¶¶ 174–86, they never articulate how their proposed future recall would differ from the recall the Defendants have already implemented. The Plaintiffs say that the "Defendants' recall and recall notice must be corrected with a new recall which adequately compensates all affected consumers and adequately notifies consumers of the dangers surrounding the recalled Product." *Id.* ¶ 187. But they never allege that they would avail themselves of this improved recall or that, after the recall, they would choose to continue using their (still-very-dangerous) Pressure Cookers. The Plaintiffs, in short, have failed to plausibly allege that a new recall would remedy their injuries.

In similar circumstances, our Court has routinely found that plaintiffs have no standing to pursue injunctive relief. *See, e.g.*, *Piescik v. CVS Pharmacy, Inc.*, 2021 WL 5996977, at *3 (S.D. Fla. Dec. 15, 2021) (Middlebrooks, J.) ("Plaintiff has not alleged any future harm to *himself*. Indeed, it is hard to imagine how Plaintiff could possibly be harmed in the future since he is now acutely aware that Defendant's hand sanitizer kills only 99.99% of many common harmful germs . . . , not 99.99% of all germs in existence."); *Wasser v. All Mkt., Inc.*, 329 F.R.D. 464, 471 (S.D. Fla. 2018) (Scola, J.) (finding no standing because "the Plaintiffs actually know the truth underlying that labeling and thus cannot be deceived by it in the future"); *Seidman v. Snack Factory, LLC*, 2015 WL 1411878, at *5 (S.D. Fla. Mar. 26, 2015) (Cohn, J.) (holding that a plaintiff "lack[ed] standing to pursue the requested injunctive relief because he has not alleged intent to purchase [the] Defendant's Pretzel Crisps in the future"); *Barron v. Snyder's-Lance, Inc.*, 2015 WL 11182066, at *10 (S.D. Fla. Mar. 20, 2015) (Lenard, J.) ("The Court finds that Plaintiffs have not established a real and immediate threat of future injury, because they have not alleged that they intend to purchase the allegedly mislabeled product again.").

Against all this, the Plaintiffs raise two main arguments—both unavailing.

*First*, they contend that "[a]ll Plaintiffs are 'aggrieved' under FDUTPA," and that this *aggrievement* "allow[s] them all to pursue . . . injunctive relief under FDUTPA." MTD Response at 20. This may be true. But whether our Plaintiffs can pursue injunctive relief under state law has no bearing on whether they have *standing* to invoke our jurisdiction. *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 (1998) ("The latter question is an issue of *statutory* standing. It has nothing to do with whether there is case or controversy under Article III."); *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) ("Article III standing requires a concrete injury even in the context of a statutory violation." (cleaned up)); *Gardner v. Mutz*, 962 F.3d 1329, 1340 (11th Cir. 2020) ("[T]he issue here is not *statutory* jurisdiction or standing, but rather whether the plaintiffs have satisfied the irreducible constitutional minimum standing requirements that emerge from Article III." (cleaned up)).

23

*Second*, the Plaintiffs try to articulate a kind of policy argument, contending that *other* (unsuspecting) consumers *might* be injured in the future if the Plaintiffs cannot proceed with their request for injunctive relief. Here's how they structure this argument:

> Plaintiffs seek injunctive relief so that the Products are adequately recalled and consumers warned about their dangers. Defendants' insufficient and misleading recall is ongoing and Plaintiffs are not only members of the public who are put at risk by the Product, but they own the Products themselves or have close family members who do. Further, a number of courts have looked to the broad remedial purposes of consumer protection statutes to find that plaintiffs seeking injunctive relief relating to consumer products have standing to seek such relief. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969 (9th Cir. 2018)[.]

MTD Response at 21.

In one sense, we share the Plaintiffs' concern: If people are stripped of their standing to stop consumer deception *once* they've learned they've been deceived, then the only citizens capable of protecting the public through the judicial system would lose their right to reach the federal courts. Still, we aren't persuaded for two reasons. *One*, standing is an "irreducible constitutional minimum," *Lujan*, 504 U.S. at 560, and we're not free to set aside the limits the Constitution has placed on our jurisdiction on the basis of what may seem like sound policy judgments. *Two*, things aren't nearly as bad as the Plaintiffs would make them out to be. In our federalist system, plaintiffs can—even in the absence of a federal forum—find relief in state courts, which often have no standing requirements. *See ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989) ("[T]he state courts are not bound to adhere to federal standing requirements[.]"). And, as we've said, some courts *have* opened up the federal forum to previously-deceived plaintiffs—so long as those plaintiffs plausibly allege that *they* (and not merely others) are likely to be harmed again in the future. That, of course, is exactly what *Davidson* held. Unfortunately, our Plaintiffs haven't alleged *that* baseline constitutional minimum here, so we have no power to grant them injunctive relief.

\*     \*     \*

The Plaintiffs are fully aware that their Pressure Cookers suffer from defects. They never say

that a warning would address any of their injuries; they never suggest that they intend to purchase a Pressure Cooker again in the future; and they never claim that they would avail themselves of any renewed recall the Defendants might implement. They, therefore, lack standing to pursue the injunctive relief they've requested. [12]

## II.     The Merits

### A.     Breach of Express Warranty under Florida Law (Count II)

Turning now to the merits, we begin with the Plaintiffs' claim for breach of an express warranty under Florida law (Count II). "[A] written warranty is treated like a contract between the seller and the buyer." *Aprigliano v. Am. Honda Motor Co.*, 979 F. Supp. 2d 1331, 1340 (S.D. Fla. 2013) (Altonaga, J.). "In order to properly plead a cause of action for breach of warranties under the Florida Uniform Commercial Code[,] a complaint should contain at least the following allegations: (1) [f]acts in respect to the sale of the goods; (2) [i]dentification of the types of warranties created[;] . . . (3) [f]acts in respect to the creation of the particular warranty[;] . . . . (4) [f]acts in respect to the breach of the warranty; (5) [n]otice to seller of the breach[;] . . . [and] (6) [t]he injuries sustained by the buyer as a result of the breach of warranty." *Dunham-Bush, Inc. v. Thermo-Air Serv., Inc.*, 351 So. 2d 351, 353 (Fla. 4th DCA 1977) (cleaned up); *see also Moss v. Walgreen Co.*, 765 F. Supp. 2d 1363, 1368 (S.D. Fla. 2011) (Cohn, J.) (setting out these same elements).

Which brings us to a threshold question: What's the "express warranty" in our case? The Defendants ask us to focus *exclusively* on the Product's Written Express Warranty—which (they argue)

---

[12] In the Plaintiffs' claim for "Injunctive and Declaratory Relief" (Count XII), the Plaintiffs also (plainly) seek declaratory relief. *See* Complaint at 110–11. Specifically, they ask for "a declaration that the Pressure Cooker has a common Defect in its design and/or manufacture," *id.* ¶ 377, and "a declaration that this common Defect poses a serious safety risk to consumers and the public," *id.* ¶ 378. The Defendants never contest the Plaintiffs' standing to seek declaratory relief, *see generally* MTD—nor do we see any valid reason for doing so. The Defendants have thus forfeited this argument (at least for now). *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances[.]").

precludes the Plaintiffs' express-warranty claim and, in any event, was never breached. *See* MTD at 8–10. The Plaintiffs counter that the Defendants "created and breached *two* express warranties": 1) the Written Express Warranty; and 2) "an express warranty on [the Defendants'] packaging, labeling[,] and marketing materials *in addition* to the Written Express Warranty[.]" MTD Response at 5 (emphasis added & cleaned up).

We agree with the Plaintiffs that we needn't restrict our analysis to the terms of the Written Express Warranty. In Florida, "[e]xpress warranties by the seller are created as follows":

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

FLA. STAT. § 672.313(1); *see also id.* § 672.313(2) ("It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that the seller have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."). Indeed, one judge on our Court has sensibly held that, under Florida law, "statements made in promotional materials, advertisements, and brochures may be sufficient to create an express warranty if the buyer relies on those statements in making his purchase." *Aprigliano*, 979 F. Supp. 2d at 1341; *see also State Farm Ins. Co. v. Nu Prime Roll-A-Way of Miami, Inc.*, 557 So. 2d 107, 108 (Fla. 3d DCA 1990) ("A seller's representations in newspaper advertisements, catalogues, circulars, etc., may become a part of the contract of sale and constitute an express warranty for breach of which the seller will be liable for damages to one who, in making the purchase, relies thereon to his injury." (cleaned up)).

26

In our case, the Plaintiffs have filled the Complaint with "descriptions of the goods" that (they say) formed the "basis of the bargain[.]" FLA. STAT. § 672.313(1). "Specifically, Defendants labeled and marketed their new Pressure Cooker as 'TRUSTED,' proclaiming that the Product 'features a locking, air-tight lid that stays sealed under pressure for total peace-of-mind.'" Complaint ¶ 2; *see also id.* ¶¶ 50–56 (showing that the Defendants included these same assurances on the Pressure Cooker's packaging, on their websites, on their social-media accounts, on their third-party retailers' websites, in the Owner's Guide, and in their recipe book). And each of the Plaintiffs alleges that he or she *relied* on those affirmations in deciding to purchase the Pressure Cookers. *See id.* ¶ 69 ("Plaintiffs and members of the Class and the Subclasses acquired their Pressure Cookers reasonably believing Defendants' representations that they were properly designed, manufactured and built with proper components, and free from defects, and safe for their intended, foreseeable use."). We therefore find that the Plaintiffs have identified these *other* representations—separate and apart from the express warranties the Defendants included in the Written Express Warranty—as express warranties they relied on.

And the Plaintiffs have plausibly alleged the six elements of an express-warranty claim under Florida law. *First*, they aver that they (or their family members) purchased the Pressure Cookers.[13] *See* Complaint ¶¶ 30–36. *Second*, as we've just said, they identify the "express warranty provided by the Defendants on the Product packaging and in their Owner's Manual." *Id.* ¶ 237. *Third*, they give us the

---

[13] The Defendants never suggest that Rife cannot state a viable express-warranty claim simply because she received her Pressure Cooker as a gift. *See generally* MTD; *see also* Complaint ¶ 30 ("In December 2017, Ms. Rife received the [Pressure Cooker] as a present from her daughter, Plaintiff Nicolle Kainrath[.]"). And for good reason. *See* FLA. STAT. § 672.318 ("A seller's warranty whether express or implied extends to any natural person who is in the family or household of his or her buyer, who is a guest in his or her home or who is an employee, servant or agent of his or her buyer if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty.").

facts surrounding "the creation of the express warranty[.]" *Dunham-Bush*, 351 So. 2d at 353. Specifically, they tell us that the Defendants represented that the Pressure Cooker "features a locking, air-tight lid" on the Product's packaging, in the Owner's Guide and recipe book that accompany the Product after sale, on their websites, on their social-media sites, and via their third-party retailers. *See* Complaint ¶¶ 50–56; *see also id.* ¶¶ 238–42 (alleging that the Defendants warranted that the Pressure Cooker was free of defects and that the Owner's Guide further said that the Defendants would "repair or replace" any defective products). *Fourth*, the Plaintiffs insist that the Defendants breached these warranties by providing a product that was "not free of defects" and by "fail[ing]" to repair or replace the defective Pressure Cookers. *Id.* ¶¶ 248, 250–52. In particular, the Defendants have provided detailed accounts of the Product's two main defects: the Lid Lock Defect and the Abnormal Close Defect. *See id.* ¶¶ 72–125. *Fifth*, the Plaintiffs say that they "[a]ll . . . notified [the] Defendants of their breach of express warranty." *Id.* ¶ 251. *Sixth*, the Plaintiffs claim that they have all "suffered damages" as a result of the defects. *Id.* ¶ 258. At this early stage of the litigation—and viewed in the light most favorable to the Plaintiffs—that's more than sufficient to state an express-warranty claim under Florida law.

Notably, we'd reach the same result even if we considered *only* the Written Express Warranty, which "warrants that[,] for a period of one year from the date of purchase, this product will be free from defects in material and workmanship." Written Express Warranty. That's because the Plaintiffs aver that the Pressure Cookers were *not* "free from defects in material and workmanship." *Ibid.*; *see also* Complaint ¶ 3 ("Despite Defendants' claims of quality design and manufacturing, and safety protection features, Defendants designed, manufactured, marketed, and sold a Pressure Cooker that suffers from serious and dangerous design, manufacturing and/or material defects."); *id.* ¶ 248 ("Defendants breached their express warranties by selling the Pressure Cooker that was, in actuality, not free of defects, not made for years of dependable operation, not made from merchantable material

and workmanship, and could not be used for the ordinary purpose of preparing meals at home without the risk of the defect manifesting itself."); *id.* ¶¶ 72–125 (detailing the Product's defects). And, at this phase of the case, we must "accept the allegations of the complaint as true and must construe the facts alleged in the light most favorable to the plaintiff." *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994) (quoting *Fortner v. Thomas*, 983 F.2d 1024, 1027 (11th Cir. 1993)).

Resisting this conclusion, the Defendants advance three arguments—all unpersuasive.

*First*, they claim that Count II is premised on *design* defects and that the Written Express Warranty, which covers "defects in materials and workmanship," applies only to *manufacturing* defects. MTD at 8–9. Some courts (it's true) have held that "materials and workmanship" is a "specialized phrase that refers particularly to *manufacturing* defects." *Vazquez v. Gen. Motors, LLC*, 2018 WL 447644, at *3 (S.D. Fla. Jan. 16, 2018) (Gayles, J.) (emphasis added); *see also Rice v. Sunbeam Prods., Inc.*, 2013 WL 146270, at *12 (C.D. Cal. Jan. 7, 2013) (dismissing a design-defect claim under the same warranty we have here because the phrase "free from defects in materials and workmanship" applies "only to manufacturing defects, not design defects" (cleaned up)); *Coba v. Ford Motor Co.*, 932 F.3d 114, 122 (3d Cir. 2019) ("[C]ourts have regularly rejected [the] argument[ ] . . . that a design defect is within the scope of a materials-and-workmanship warranty clause.").

But the Florida Supreme Court has said that "manufacturing flaws" come about "where products do not conform to planned specifications due to manufacturing error," while "design defects" occur "where products are produced as designed but the design itself is defective." *Ford Motor Co. v. Hill*, 404 So. 2d 1049, 1051 (Fla. 1981). Our Plaintiffs allege that the Lid Lock Defect and the Abnormal Close Defect constitute *both* design *and* manufacturing defects. *See, e.g.*, Complaint ¶ 106 ("In addition to implementing the above dangerous Defects into their *design and manufacturing* process of their Product . . . ." (emphasis added)); *id.* ¶ 165 ("Even so, the recall failed to address many of the known *design and manufacturing defects*, and falsely blamed consumers for misusing the Product and

causing their incidents and injuries." (emphasis added)); *id.* ¶ 252 ("Defendants breached their express warranty to repair or replace the defective Pressure Cooker when they failed to do so despite their knowledge of the Defects, and/or their knowledge of alternative designs, materials and/or *options for manufacturing* the Pressure Cooker." (emphasis added)). And, at this early stage of the case, we should be careful not to arbitrarily classify these (alleged) defects as falling into either one category or the other. *See Grasso v. Electrolux Home Prods., Inc.*, 2015 WL 10792014, at *2 (S.D. Fla. Aug. 24, 2015) (Scola, J.) (denying a motion to dismiss an express-warranty claim because the plaintiffs "may be able to establish that defective materials or workmanship" caused the allege defects); *Alin v. Am. Honda Motor Co.*, 2010 WL 1372308, at *4–5 (D.N.J. Mar. 31, 2010) (same); *cf. Bailey v. Janssen Pharm. Inc.*, 288 F. App'x 597, 605 (11th Cir. 2008) ("We are not convinced that Florida law applies a rigid distinction among the various theories of recovery available to plaintiffs under strict products liability such that a plaintiff would be required to expressly plead 'design defect' versus 'manufacturing defect' at the complaint stage.").

*Second*, the Defendants challenge the express-warranty claim for failing to establish that the Defendants "were unable to repair the defect after a reasonable time or a reasonable number of attempts[.]" MTD at 9 (quoting *Bailey v. Monaco Coach Corp.*, 350 F. Supp. 2d 1036, 1043 (N.D. Ga. 2004) (applying Florida law)). But, even if *ability to repair* were an element of an express-warranty claim under Florida law—we don't think it is—"some district courts have found that knowledge of a defect at the time of sale is itself a sufficient opportunity to cure." *Felice v. Invicta Watch Co. of Am., Inc.*, 2017 WL 3336715, at *6 (S.D. Fla. Aug. 4, 2017) (Rosenberg, J.). And our Plaintiffs *have* alleged that the Defendants refused to repair the Product's defects—despite knowing for years about the Pressure Cooker's propensity for explosion. *See, e.g.*, Complaint ¶ 252 ("Defendants breached their express warranty to repair or replace the defective Pressure Cooker when they failed to do so despite their knowledge of the Defects, and/or their knowledge of alternative designs, materials, and/or options

for manufacturing the Pressure Cooker."); *see also id.* ¶¶ 156–84 (detailing the many ways in which the Defendants were informed about the defects *before* the Plaintiffs bought their defective Pressure Cookers). We think these allegations of prior knowledge is sufficient to get the Plaintiffs' express-warranty claim past a motion to dismiss.

*Third*, the Defendants argue that the Written Express Warranty "disclaims" the Plaintiffs' sought-after damages because it limits their remedies to repair and replacement *only*. *See* MTD at 10; *see also* Written Express Warranty ("JCS, at its option, will repair or replace this product or any component of the product found to be defective during the warranty period. Replacement will be made with a new or remanufactured product or component. If the product is no longer available, replacement may be made with a similar product of equal or greater value. This is your exclusive warranty . . . . JCS shall not be liable for any incidental or consequential damages caused by the breach of any express, implied or statutory warranty or condition."). And (the Defendants add) Florida law "allows a warrantor to limit remedies under an available express warranty." MTD at 10 (citing FLA. STAT. § 672.719(1)(a) ("The agreement . . . may limit or alter the measure of damages recoverable . . . as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts[.]")); *Davenport v. Thor Motor Coach, Inc.*, 2015 WL 13021664, at *4 (M.D. Fla. Aug. 6, 2015) (Adams, Jr., J.) ("Florida law allows a manufacturer to limit the remedies under a warranty to the repair or replacement of defective parts.").

Two problems with this argument. *One*, to the extent that the Defendants didn't provide these disclaimers to the Plaintiffs until *after* the Plaintiffs had bought the Pressure Cookers—a chronology the Plaintiffs will be permitted to flesh out in discovery—those post-purchase disclaimers (it goes without saying) couldn't have viated the Plaintiffs' legal rights. *See Bowdoin v. Showell Growers, Inc.*, 817 F.2d 1543, 1545–46 (11th Cir. 1987) ("By definition, a disclaimer that appears for the first time after the sale in something supplied by the seller is not a part of the basis of the bargain and therefore is

not binding on the buyer."); *see also Rehurek v. Chrysler Credit Corp.*, 262 So. 2d 452, 455 (Fla. 2d DCA 1972) ("[T]he disclaimer clause in the warranty booklet is immaterial because it was not incorporated into the contract and therefore was not a basis for the bargain."). *Two*, under Florida law, "[w]here circumstances cause an exclusive or limited remedy *to fail of its essential purpose*, remedy may be had as provided in this code." FLA. STAT. § 672.719(2) (emphasis added). And our Plaintiffs *do* allege that the Written Express Warranty *fails of its essential purpose*. *See* Complaint ¶ 253 ("To the extent that Defendants have repaired or replaced the defective parts for some Class members, the warranty of repair or replacement fails in its essential purpose because it is insufficient to make Plaintiffs and Class members whole and/or because Defendants have failed to provide the promised remedy within a reasonable time."); *see also* MTD Response at 8 ("To the extent the WEW is applicable to Plaintiffs' claims, these same latent defects cause the WEW to fail in its essential purpose, and render any limitations contained in the warranty unconscionable and unenforceable."). Whether the Written Express Warranty failed of its essential purpose is, of course, a question of fact we'll leave for summary judgment (or trial). *See Bello v. Caterpillar, Inc.*, 2018 WL 2214709, at *7 *(S.D. Fla. Apr. 10, 2018) (Altonaga, J.) (denying summary judgment on a warranty claim where the plaintiffs argued that a repair-or-replace warranty failed of its essential purpose).

For all these reasons, we **DENY** the MTD as to Count II of the Complaint.

### B. Breach of Implied Warranty of Merchantability under Florida Law (Count III)[14]

The Purchasing Plaintiffs' implied-warranty claim is a different story. The Defendants attack Count III in two ways. *First*, they argue that the claim fails as a matter of law because the Purchasing

---

[14] The Plaintiffs say that "[t]his claim is brought pursuant to the common law of the State of Florida because the warranty provided by Defendants on the product packaging and in their Owner's Manual emanate from its principal offices located in Florida, and decision-making surrounding its Product and defects in the Product are made in Florida." Complaint ¶ 260. We'll thus analyze this claim only under Florida law.

Plaintiffs "lack [ ] privity" with [the] Defendants." MTD at 10. *Second*, they contend that Rife's claim "is subsumed by her product liability claims." *Id.* at 11 (cleaned up). They're right on both counts.

"Under Florida law, privity of contract is required to maintain an action for breach of an implied warranty." *Ocana v. Ford Motor Co.*, 992 So. 2d 319, 325 (Fla. 3d DCA 2008) (cleaned up); *see also Mesa v. BMW of N. Am., LLC*, 904 So. 2d 450, 458 (Fla. 3d DCA 2005) ("Under Florida law, a plaintiff cannot recover economic losses for breach of implied warranty in the absence of privity." (cleaned up)); *Kelly v. Lee Cnty. RV Sales Co.*, 819 F. App'x 713, 717 (11th Cir. 2020) (same). This bright-line rule finds its origins in *Kramer v. Piper Aircraft Co.*, 520 So. 2d 37, 39 (Fla. 1988), where the Florida Supreme Court interpreted its earlier decision in *West v. Caterpillar Tractor Co.*, 336 So. 2d 80 (Fla. 1976), as "supplant[ing] common law implied warranty in the absence of privity of contract in those instances in which a cause of action for strict liability is appropriate." *Kramer*, 520 So. 2d at 39. In *Kramer*'s view:

> The *West* court fundamentally altered products liability law in Florida by creating a new products liability tort action—strict liability in tort—out of the prior breach of implied warranty cases which had done away with privity of contract. In so doing, *West* necessarily swept away such no-privity, breach of implied warranty cases in favor of the new action of strict liability in tort. Stated differently, the doctrine of strict liability in tort supplants all no-privity, breach of implied warranty cases, because it was, in effect, created out of these cases. This ground-breaking holding, however, did not result in the demise of the contract action of breach of implied warranty, as that action remains, said the *West* court, where privity of contract is shown.

*Kramer*, 520 So. 2d at 39 (quoting *Affiliates for Evaluation and Therapy, Inc. v. Viasyn Corp.*, 500 So. 2d 688, 692 (Fla. 3d DCA 1987)).[15]

---

[15] Before *Kramer* (it's true), Florida law allowed implied-warranty claims *without* a showing of privity between the manufacturer and the ultimate consumer. *See Manheim v. Ford Motor Co.*, 201 So. 2d 440, 442 (Fla. 1967) ("We conclude that neither the absence of privity between the manufacturer and a purchaser . . . nor the execution of a written warranty agreement between the manufacturer and its dealer of the kind hereinbefore appearing operates to preclude recovery on the basis of implied warranty of a product due to its defects and lack of fitness and suitability."). But *Kramer* changed all that. *See Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1233 (S.D. Fla. 2014) (Dimitrouleas, J.) ("While the Florida Supreme Court may very well explain in the future that *Kramer* has not effectively overruled *Manheim*, the best indication for this Court at the present of what the Florida Supreme Court

Our Plaintiffs nonetheless insist that they can assert their implied-warranty claims, "even without direct privity, as long as [they] adequately allege[ ] [they were] third-party beneficiar[ies] of the contract for the sale of the product." MTD Response at 9 (quoting *Pegasus Aviation IV, Inc. v. Aircraft Composite Techs., Inc.*, 2016 WL 3390122, at *5 (S.D. Fla. June 17, 2016) (Ungaro, J.) ("Plaintiff can state a claim for breach of express warranty and breach of implied warranty of merchantability, even without direct privity, as long [as] Plaintiff adequately alleges that it was a third party beneficiary of the contract for the sale[.]" (cleaned up))); *see also Sanchez-Knutson*, 52 F. Supp. 3d at 1233–34 ("Plaintiff can pursue a claim of breach of implied warranty through third-party beneficiary law." (cleaned up)); *Ohio State Troopers Ass'n v. Point Blank Enters., Inc.*, 2018 WL 3109632, at *7 (S.D. Fla. Apr. 5, 2018) (Ungaro, J.) ("Plaintiffs have also properly alleged privity as third-party beneficiaries." (cleaned up)).

But these federal district-court decisions do not bind us. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (cleaned up) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (quoting J. Moore et al., MOORE'S FEDERAL PRACTICE § 143.01[1][d] (3d ed. 2011))); *see also Brown Jordan Int'l, Inc. v. Carmicle*, 2015 WL 11660246, at *4 (S.D. Fla. June 3, 2015) (Rosenberg, J.) (same). Instead, when we sit in diversity—as we do here—we look to Florida law. *See Fox v. Ritz-Carlton Hotel Co., L.L.C.*, 977 F.3d 1039, 1049 (11th Cir. 2020) ("[T]he *Erie* doctrine commands that we apply the substantive law of Florida, the forum state, in this diversity action filed in the Southern District of Florida. In interpreting Florida law, we look first for case precedent from the Florida Supreme Court. Where we find none, we are bound to adhere to decisions of the state's intermediate

---

would decide is the Third District Court of Appeal's holding in *Mesa*, that, '[u]nder Florida law, a plaintiff cannot recover economic losses for breach of implied warranty in the absence of privity.'" (cleaned up)).

appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." (cleaned up)).

And, as we've said, Florida law, since *Kramer* in 1988, requires a showing of privity between manufacturer and consumer—except in the three limited circumstances set out in FLA. STAT. § 672.318, which provides: "Third-party beneficiaries of warranties express or implied.—A seller's warranty whether express or implied extends to any natural person who is in the family or household of his or her buyer, who is a guest in his or her home or who is an employee, servant or agent of his or her buyer if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude nor limit the operation of this section."

So, for instance, in *Warren v. Monahan Beaches Jewelry Ctr.*, 548 So. 2d 870 (Fla. 1st DCA 1989)— the one post-*Kramer* Florida case cited in those district-court decisions the Purchasing Plaintiffs rely on—the First DCA allowed the fiancée of a man who bought an engagement ring to bring an implied-warranty claim against the jeweler, *id.* at 872. In doing so, the court explained that "the precontract dealings between the [buyer] and [the jeweler], and the subsequent dealings between the [fiancée] and [the jeweler], clearly establish [the fiancée] as an intended third-party beneficiary of the contract at issue." *Ibid.* (citing *Goodell v. K.T. Enters., Ltd.*, 394 So. 2d 1087, 1089 (Fla. 1st DCA 1981)).

In *Goodell*, which *Warren* relied on, the First DCA found the seller of a defective conveyor belt liable for breach-of-contract to a third-party baker—even though he had sold the belt directly to the bakery's president, not to the bakery—because "[t]he agreement provided that [the seller] would ship the unit to [the bakery,] . . . . [the seller's president] admitted knowing the conveyor was for [the bakery,] . . . . [and because] the president of [the bakery] discussed the design of the unit at length with [the seller.]" *Goodell*, 394 So. 2d at 1088–89.

In both cases, then, the contracting parties (including the seller) had identified a single third party—the fiancé in *Warren*, the bakery in *Goodell*—as the intended third-party beneficiary of their contract. And, in each case, the buyer fell into one of the three exceptions to the privity requirement set out in the Florida statute: the fiancée in *Warren* as a member of the ring buyer's "family or household"; and the bakery in *Goodell* as an "agent of [the] buyer." And the statute is clear that it provides the only exceptions to Florida's privity requirement for "[t]hird-party beneficiaries of warranties express or implied." FLA. STAT. § 672.318. Which is all in the way of saying that a plaintiff who isn't in privity with the manufacturer of a defective product cannot bring an implied-warranty claim against that manufacturer unless (1) he's in privity with the manufacturer or (2) he fits into one of the three exceptions outlined in § 672.318. *See Kramer*, 520 So. 2d at 39 n.4 ("The implied warranty cause of action remains unaltered where privity of contract exists and in those cases which fall within the scope of [§ 672.318].").

Our Purchasing Plaintiffs fall into neither bucket. They aren't in privity with the Defendants, and they don't qualify for one of the three exceptions set out in § 672.318. They thus cannot assert an implied-warranty claim against the manufacturer. Put another way, contra the situation the First DCA faced in *Warren*, the parties' dealings in our case don't "clearly express the [Defendants' and their retailers'] intent to create a right primarily and directly benefiting [the Purchasing Plaintiffs]." *Warren*, 548 So. 2d at 872.

Even if the Purchasing Plaintiffs could bring their implied-warranty claims as third-party beneficiaries to the contracts between the Defendants and their retailers, the Complaint's allegations on this issue are far too conclusory to invoke that doctrine here. The Complaint, after all, does little more than assert the *legal conclusion* that the Plaintiffs are third-party beneficiaries of the contracts between our Defendants and their retailers. *See, e.g.*, Complaint ¶ 267 ("Plaintiffs Kainrath, Griffin, Brown, Casey, and Naegele and Class members have privity of contract with Defendants through their

purchases of the Pressure Cooker, and through the express written and implied warranties Defendants issued to its customers. Defendants' warranties accompanied the Pressure Cooker and were intended to benefit the ultimate consumers."). The Plaintiffs also generally (and implausibly) speculate that the Defendants might have "a controlling interest" in "any retailers which sold the Products[.]" *Id.* ¶ 202. We needn't accept these conclusory (and implausible) allegations as true. *See Iqbal*, 556 U.S. at 681 ("It is the conclusory nature of [the Plaintiffs'] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."). And many of our colleagues have reached a similar result in near-identical circumstances. *See, e.g.*, *Padilla v. Porsche Cars N. Am, Inc.*, 391 F. Supp. 3d 1108, 1119 (S.D. Fla. 2019) (Moreno, J.) ("Finally, even if the third-party beneficiary exception exists under Florida law, Plaintiffs' conclusory allegations—that they were the intended third-party beneficiaries of contacts between Porsche and its dealers and Porsche's implied warranties—fall short of invoking this exception to the privity requirement." (cleaned up)); *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1224 (S.D. Fla. 2017) (Williams, J.) ("A claim for a breach of implied warranty under a third-party beneficiary theory, if it exists, does not arise from the conclusory assertion that Plaintiffs were the intended third-party beneficiaries of contracts between Defendants and its dealers." (cleaned up)); *Toca v. Tuto, LLC*, 430 F. Supp. 3d 1313, 1325 (S.D. Fla. 2020) (Singhal, J.) ("For the third-party-beneficiary exception, he fails to cite to a single allegation in the Amended Complaint, opting to rely only on the language of the *Ohio State Troopers Association* case. The Court cannot find any allegations in the Amended Complaint that would satisfy this exception even on its own, independent review of the pleading." (cleaned up)). In short, because the Purchasing Plaintiffs aren't in privity with the Defendants—and because they don't qualify for one of the statutory exceptions to the privity requirement—their implied-warranty claim cannot proceed.[16]

---

[16]     One more point on this: "Florida courts have found the privity requirement to be satisfied

The unviability of Rife's claim is even more straightforward. She's never been in privity with the Defendants—since she never bought her Pressure Cooker from anyone—and she has an (unchallenged) claim for strict product liability. *Kramer*, then, plainly bars her implied-warranty claim. *See Kramer*, 520 So. 2d at 39–40 ("Although we did not expressly state in *West* that the common law implied warranty claim for personal injury no longer exists under Florida law absent privity, it is implicit from the language of the opinion that it was this Court's intent to abolish that cause of action where the remedy of strict liability is appropriate.").

We thus **GRANT** the MTD as to Count III.

### C.    Breach of Express and Implied Warranties under the Magnuson-Moss Warranty Act (Count I)

The parties stipulate that the Plaintiffs' claims under the MMWA rise and fall with their claims under Florida law. *See* MTD at 11–12 ("Breach of warranty claims under the Magnuson-Moss Warranty Act are identical to state statutory warranty claims, *see Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1231 (11th Cir. 2016), and therefore stand or fall with [plaintiffs'] express and implied warranty claims under state law, *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008)." (cleaned up)); *see also* MTD Response at 11 n.13 (admitting that the Plaintiffs' MMWA claim is "based

---

when a manufacturer directly provides a warranty to, or otherwise has direct contact with, a buyer who purchases from a third party." *Global Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1032 (11th Cir. 2017) (cleaned up). But the Plaintiffs never suggest that they qualify for this exception. *See generally* MTD Response. They've thus forfeited any such claim. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed [forfeited]." (cleaned up)).

Even if they had made this argument, though, we would have rejected it because the Complaint never alleges any "direct contact" between the Defendants and the Purchasing Plaintiffs. *See, e.g., Cedars of Lebanon Hosp. Corp. v. European X-Ray Distribs. of Am., Inc.*, 444 So. 2d 1068, 1072 n.4 (Fla. 3d DCA 1984) ("We wish to emphasize that we are focusing on the direct contacts between the manufacturer and the ultimate purchaser/consumer in finding that privity exists in this case. Had there been no direct contact between the two parties, appellee's contention that there was no privity, and thus no liability for breach of warranties, would be correct. It is the direct contacts which create the express and implied warranties under sections 672.313 and 672.315, Florida Statutes (1981).").

on the same laws" as their express- and implied-warranty claims).

And we agree. *See, e.g.*, *Ocana*, 992 So. 2d at 324 ("The question whether a warrantor has committed a breach of a limited express warranty under the [MMWA] is governed by state law." (cleaned up)); *Burns v. Winnebago Indus., Inc.*, 2012 WL 171088, at *4 (M.D. Fla. Jan. 20, 2012) (Bucklew, J.) ("Because Plaintiff['s] breach of express warranty claim under Florida's UCC fails, [his] breach of express warranty claim under the MMWA necessarily fails also." (cleaned up)). Since we denied the MTD as to Count II and granted it as to III, we now **DENY** the MTD **in part** as to that portion of Count I that's premised on an express warranty and **GRANT** the MTD **in part** as to that part of Count I that's based on an implied warranty.

### D.     The Purchasing Plaintiffs' Tort Claims (Counts IV and VI)

The Defendants next argue that the "economic loss doctrine" bars the Purchasing Plaintiffs' claims for negligence (Count IV) and strict-product liability (Count VI).[17] *See* MTD at 12–13. Here, they're *mostly* right.

"[T]he economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Co., Inc.*, 110 So. 3d 399, 401 (Fla. 2013). "[T]he roots of the rule may be found in the products liability context. The products liability economic loss rule developed to protect manufacturers from liability for economic damages caused by a defective product beyond those damages provided by warranty law." *Id.* at 403. And, in *Tiara*, the Florida Supreme Court "limit[ed] the application of the economic loss rule to cases involving products liability." *Id.* at 407; *see also Bornstein v. Marcus*, 169 So. 3d 1239, 1244 (Fla. 4th DCA 2015) ("Because the instant case does not involve products liability, the trial court erred in dismissing the tort claims against the firm under the

---

[17] As we've said, the Defendants don't challenge the sufficiency of *Rife's* claims for negligence and strict-product liability in Counts XIV and XVI, respectively. *See supra* note 7.

economic loss rule."). Economic loss includes "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—*without any claim of personal injury or damage to other property.*" *Tiara*, 110 So. 3d at 401 (emphasis added). In other words, claims for personal injury or property damage are *exceptions* to the economic-loss rule. *See Auto-Owners Ins. Co. v. Ace Elec. Serv., Inc.*, 648 F. Supp. 2d 1371, 1380–81 (M.D. Fla. 2009) (Fawsett, J.) ("Economic losses are disappointed economic expectations, or more broadly[,] the loss of the benefit of the bargain. The rule applies . . . when there is a defect in a product that causes damage to the product but causes no personal injury or damage to other property." (cleaned up)).

Our case—it almost goes without saying—is a products-liability case, so the economic-loss rule applies. The only question, then, is whether the Purchasing Plaintiffs have pled that they suffered personal injuries or property damage. And, for the most part, they haven't: Plaintiffs Kainrath, Brown, Casey, and Naegele have failed to allege that they've suffered any personal injuries or damage to other property. *See, e.g.*, Complaint ¶ 31 ("Plaintiff Kainrath would not have purchased the Product if she had known of the Defects or that the Product was unfit to perform its intended purpose, rendering the Product useless."), ¶¶ 34–36 (alleging that Plaintiffs Brown, Casey, and Naegele "would not have purchased the Product or would have sought substantially different terms if [they] had known of the Defects and/or that the Product was unfit to perform its ordinary and intended purpose"). *Their* tort claims, in short, are barred by the economic-loss rule. *See Aprigliano*, 979 F. Supp. 2d at 1336–37 (dismissing a strict-liability claim by purchasers of defective motorcycles who "[did] not allege [that] they suffered a personal injury or an injury to property"); *see also In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324, 1342 (S.D. Fla. 2016) (Moreno, J) ("Similarly, in Florida, the economic loss rule means a manufacturer 'has no duty under either a negligence or strict products liability theory to prevent a product from injuring itself.'" (quoting *Fla. Power & Light Co. v. Westinghouse Elec. Corp.*, 510 So. 2d 899, 901 (Fla. 1987)); *Melton v. Century Arms, Inc.*, 243 F. Supp. 3d 1290, 1300–02 (S.D. Fla.

2017) (Moreno, J.) (dismissing fraudulent-inducement and negligent-misrepresentation claims under the economic-loss rule because the plaintiffs "allege only economic harm arising from the claims, precisely what a breach of warranty claim would allege—namely that Century's rifles did not work as promised").

Trying to parry this result, the Plaintiffs advance three arguments—all meritless.

*First*, they call the Defendants' economic-loss contentions "premature[,] since Plaintiffs' allegations are well-pled." MTD Response at 11. But, as the cases we've cited make clear, a complaint alleging economic loss in a cause of action for strict-product liability isn't "well-pled" and must be dismissed. *See Burns v. Winnebago Indus., Inc.*, 2013 WL 4437246, at *3–4 (M.D. Fla. Aug. 13, 2013) (dismissing claims for fraudulent inducement and negligent misrepresentation where a purchaser did not allege "any injuries or damage to other property").

*Second*, the Plaintiffs note that Rife's injuries qualify as "one of the noted exceptions to the doctrine." MTD Response at 11. That's true—which is why Rife's claims aren't barred by the economic-loss rule. But "physical injury to third parties [like Rife] is insufficient to satisfy this economic loss rule exception [of personal injury or damage to other property]" vis-à-vis the *other* Plaintiffs. *Turbomeca, S.A. v. French Aircraft Agency, Inc.*, 913 So. 2d 714, 716 (Fla. 3d DCA 2005); *see also Dent v. Composite Structures, Inc.*, 2009 WL 3818464, at *3 (M.D. Fla. Nov. 13, 2009) (Hernandez Covington, J.) (citing *Turbomerca* and explaining that the cross-claimant "may not avoid the economic loss rule by asserting [the plaintiff's] personal injury claims").

*Third*, the Plaintiffs claim that they "allege sufficient misconduct by Defendants amounting to *independent torts*, including misrepresentation, unfair and deceptive trade practices, negligence, strict product liability, and false advertising, any one of which would allow negligence counts to proceed." MTD Response at 12 (emphasis added). But the independent-tort doctrine creates a "separate hurdle" *Tiara* "left intact," which requires "a party [to] demonstrate that . . . the tort is independent of any

breach of contract claim." *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 947 (11th Cir. 2014) (quoting *Tiara*, 110 So. 3d at 408 (Pariente, J., concurring)); *see also Prewitt Enters., LLC v. Tommy Constantine Racing, LLC*, 185 So. 3d 566, 569 (Fla. 4th DCA 2016) (explaining that "Justice Pariente's concurrence in [*Tiara*] . . . made clear that a tort still must be independent from a contractual breach under the common law" (cleaned up)). The doctrine, in other words, is *not* an exception to the economic-loss rule. It's a "separate hurdle" that's been around long before the economic-loss rule was introduced, and it applies to any action—not just product-liability cases. That's why the Eleventh Circuit in *Lamm*—a case the Plaintiffs cite—asked whether the independent-tort doctrine (not the economic-loss rule) barred the plaintiff's claim. In that case, the defendant-bank and the plaintiff-customer had entered into a "custody agreement," which the customer later alleged the bank had breached. *See Lamm*, 749 F.3d at 947. Notably, the plaintiff asserted *both* contract and tort claims. *Ibid.* The economic-loss rule didn't bar the tort claims, Judge Jordan wrote, because the case didn't (as ours does) involve a defective product. *See ibid.* ("Given the Florida Supreme Court's recent decision limiting the application of the economic loss rule to the products liability context, *see Tiara Condo. Ass'n*, 110 So.3d at 407, Mr. Lamm no longer faces this [economic-loss] hurdle."). But the court still had to decide whether the independent-tort doctrine—which prevents plaintiffs, even outside the products-liability context, from bringing a tort claim for what is in essence a contractual breach— precluded the customer's suit. Ultimately, the court determined that the customer had "failed to establish that [the bank] owed him an independent duty to monitor the investments on his account, verify their market value, or ensure they were in valid form." *Id.* at 950. Since ours is a products-liability case, *Lamm* is obviously inapposite here.

But it's important for our analysis nonetheless because it shows that the independent-tort doctrine isn't (as the Plaintiffs suggest) an exception to the economic-loss rule. The doctrine, rather, operates as a "separate hurdle" that governs tort claims outside the arena of products liability. In other

words, a tort plaintiff who's entered into a contract with a defendant must *always* show that the tort claim he's asserting is *independent* of any contractual claim he might've had. *See Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 494 (Fla. 3d DCA 1994) ("It is well established that breach of contractual terms may not form the basis for a claim in tort. Where damages sought in tort are the same as those for breach of contract a plaintiff may not circumvent the contractual relationship by bringing an action in tort."). Otherwise, no one would bring a breach-of-contract claim. That's the essence of the independent-tort doctrine. In the specific context of products liability, though, a plaintiff cannot seek economic losses via a tort claim (independent or not) *unless* he can show "personal injury or damage to other property." *Tiara*, 110 So. 3d at 401. That's the economic-loss rule. And, since ours is a products-liability case—and given that our Purchasing Plaintiffs (with one exception we discuss just below) make no claim of personal injury or damage to other property—the economic-loss rule bars their tort claims.

All that said, Plaintiff Griffin *does* invoke the "other property" exception to the economic-loss rule, which applies to "property that is unrelated and unconnected to the product sold, and there is no privity between the owner of the property damaged and the distribution chain for the product causing the damage." OTHER PROPERTY EXCEPTION TO ECONOMIC LOSS RULE, 41A Fla. Jur. 2d Products Liability § 87 (Sept. 2022 update); *see also Aetna Life & Cas. Co. v. Therm-O-Disc, Inc.*, 511 So. 2d 992, 994 (Fla. 1987) ("[A] buyer under a contract for goods [cannot] recover economic losses in tort without a claim for personal injury or property damage to property other than the allegedly defective goods."); *Pulte Home Corp. v. Osmose Wood Preserving, Inc.*, 60 F.3d 734, 741 (11th Cir. 1995) ("To satisfy the other property exception, Pulte must establish damage to property aside from the FRT plywood treated with Osmose chemicals."). Griffin claims that the Pressure Cooker's contents "sprayed out of the pot onto [her] daughter and the surrounding kitchen cabinets, countertops and floor," *id.* ¶ 137, and that "the Pressure Cooker . . . caus[ed] damage to [her] kitchen," *id.* ¶ 140. And

this kitchen damage is sufficient—at this stage of the case—to satisfy the "other property" exception to the economic-loss rule. *See, e.g.*, *E.I. Du Pont de Nemours & Co. v. Finks Farms, Inc.*, 656 So. 2d 171, 173 (Fla. 2d DCA 1995) (finding that the economic-loss rule did not apply where a farm sued a manufacturer of fungus-killing herbicide that "was not ineffective by failing to kill fungus, but instead was defective because it damaged [the farm's] plants).[18]

We thus **GRANT in part** the MTD with respect to the Purchasing Plaintiffs' claims for economic damages in Count IV and VI. But we **DENY in part** that portion of Counts IV and VI that seeks money damages for Griffin's kitchen damage.

### E.    The Statutory Claims (Counts VII–XI)

We next address the Plaintiffs' claims under the Florida Deceptive and Unfair Trade Practices Act, *see* FLA. STAT. §§ 501.201 *et seq.* ("FDUTPA"), the Illinois Consumer Fraud and Deceptive Business Practices Act, *see* 815 ILCS §§ 505 *et seq.* ("ICFA"), the Georgia Fair Business Practices Act, *see* O.C.G.A. §§ 10-1-390 *et seq.* ("GFBPA"), the Washington Consumer Protection Act, *see* WASH. REV. CODE ANN. §§ 19.86.010 *et seq.* ("WCPA"), and the Michigan Consumer Protection Act, *see* MICH. COMP. LAWS §§ 445.901 *et seq.* ("MCPA").

As to these claims, the Defendants move along three fronts. *First*, they say that the Plaintiffs failed to satisfy the heightened pleading standards that govern fraud claims under Rule 9(b). *See* MTD at 13–15; *see also* FED. R. CIV. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). *Second*, they contend that the Plaintiffs failed to allege that the Defendants *knew* about the Pressure Cooker's defects. *See id.* at 16–17. *Third*, they argue that Rife

---

[18] Again, Rife plausibly alleges that she suffered personal injuries. *See* Complaint ¶ 30 ("Plaintiff Rife suffered substantial and painful injuries when Defendants' Pressure Cooker failed during normal use as a result of the design and material defects."). So, the economic-loss rule doesn't bar *her* tort claims.

failed to allege "facts establishing that her injuries were caused by Defendants' actions subject to state consumer protection statutes." *Id.* at 15. We consider (and reject) each argument in turn.

### 1.   Pleading Standards

The Defendants contend that "claims under FDUTPA, ICFA, WCPA, and MCPA are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b) and must be [pled] with particularity." *Ibid.* (cleaned up). As we've said before, though, "Rule 9's more stringent standard doesn't apply to all FDUTPA claims—only to those that sound in fraud." *Carter v. Ford Motor Co.*, 2021 WL 1165248, at *16 (S.D. Fla. Mar. 26, 2021) (Altman, J.) (citing cases).[19] The same is true for the ICFA, WCPA, and MCPA—as the cases the Defendants cite make clear. *See, e.g.*, *Goodman v. HTC Am., Inc.*, 2012 WL 2412070 at *16 (W.D. Wash. June 26, 2012) ("The heightened pleading requirements of Federal Rule 9(b) apply to Plaintiffs' claims *where fraud is an essential element or where Plaintiffs specifically allege fraudulent conduct . . . .* The rule does not require that allegations supporting a claim be stated with particularity when those allegations describe nonfraudulent conduct." (emphasis added and cleaned up)); *ATC Healthcare Servs., Inc. v. RCM Tech., Inc.*, 192 F. Supp. 3d 943, 954 (N.D. Ill., 2016) ("*If claims under the Act assert fraud*, they must be pled with particularity. But if they allege only unfair conduct, then they are subject to the pleading standards of Rule 8." (emphasis added & cleaned up)); *Reliable Carriers, Inc. v. Excellence Auto Carriers, Inc.*, 2012 WL 1931519, at *4 (E.D. Mich. May 29, 2012) ("Reliable argues all these claims *sound in fraud* and therefore must be pled with particularity." (emphasis added)); *see also In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 666 (E.D. Mich. 2011) ("Defendants also argue that the MCPA requires that 'claims under the MCPA for fraud or mistake

---

[19] Indeed, there's "a separate line of cases in which courts have *categorically* refused to hold FDUTPA claims to the rigors of 9(b)." *Ibid.* (citing *Harris v. Nordyne, LLC*, 2014 WL 12516076, at *4 (S.D. Fla. Nov. 14, 2014) (Bloom, J.) ("One line of cases hold that Rule 9(b) applies to the extent that the FDUTPA claim at issue is based in fraud. This Court joins several decisions in holding that the requirements of Rule 9(b) categorically do not apply to claims under FDUTPA.")).

must state the circumstances with the particularity' required by Rule 9(b). *When the claim is based on breach of express or implied warranties, these pleading strictures do not apply* but otherwise, the allegations must include the specificity required by FED. R. CIV. P. 9(b). This is not such a case." (emphasis added & cleaned up)).

We'll assume that the Plaintiffs' statutory claims sound in fraud. Even so, we deny this aspect of the MTD because, in these counts, the Plaintiffs *have* met the heightened pleading standard of Rule 9(b) "A complaint satisfies Rule 9(b) if it 'plead[s] the who, what, when, where, and how of the allegedly false statements and then allege[s] generally that those statements were made with the requisite intent.'" *Carter*, 2021 WL 1165248, at *17 (quoting *Mizarro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008)); *see also FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (explaining that a complaint satisfies Rule 9(b) if it sets out: "(1) precisely what statements were made in which documents or oral representations; and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud." (cleaned up)).

The Complaint does all of these things. As to the first two prongs (the "what" and "when"), the Complaint unambiguously delineates the Defendants' *omissions*—what they should have disclosed (the information about the Lid Lock Defect and the Abnormal Close Defect) *and* when they failed to disclose it (for any sales after May 2018). *See* Complaint ¶¶ 1–125. The Plaintiffs even identify the overt *representations* that (allegedly) misled them, including: (a) the assurances on the Pressure Cooker's packaging, *id.* ¶ 50; (b) the safety claims on the Defendants' website, *id.* ¶ 51; (c) a statement on the Defendants' Facebook page, *id.* ¶ 52; (d) the safety assertions from the Defendants' third-party retailers (like Walmart and Amazon), *id.* ¶ 54; and (e) the claims the Defendants made in the Owner's Guide and recipe book the Plaintiffs received when they bought the Products, *id.* ¶¶ 55–56.

As to the third prong, the Plaintiffs plainly allege the *content* of the Defendants' (mis)representations—including the Defendants' repeated deployment of the phrase "locking, air-tight lid" on the Pressure Cooker's packaging, *id.* ¶ 50; the Defendants' claims, on its website, that the Pressure Cooker's "[a]irtight locking lid stays locked until pressure is released for added safety," *id.* ¶ 51; and the Defendants' assurance (again on its website) that the Pressure Cooker's "[a]irtight locking lid remains locked while pressure is on inside the unit," *ibid.* As the Complaint explains:

> Prior to and at the time the Defendants distributed the Pressure Cookers from their headquarters in Florida for sale to the public they engaged in deception, false promises, misrepresentations, concealment, suppression, or omission of material facts in violation of the FDUTPA in the following ways: (a) representing in the Product packaging that their Pressure Cooker is "TRUSTED" and "the Crock-Pot brand is a leader in one pot cooking" and "features a locking, air-tight lid that stays sealed under pressure for total peace-of-mind;" (b) representing in their Owner's Manual that "Sunbeam . . . warrants that for a period of one year from the date of purchase, this product will be free from defects in material and workmanship" (Owner's Guide at p. 1); (c) representing that the "Express Crock Multi-Cooker has been designed with safety in mind and has various safety measures. 1. Pressure will not build if the Lid is not shut correctly and has not sealed." (*id.* at p. 10); (d) representing that "Once the pressure increases, the Lid cannot be opened" (*id.* at p. 10); (e) representing that "At the end of cooking, the Lid cannot be unlocked until all the pressure is released." (*id.* at p. 11); (f) representing that "The pressure has been released when steam is no longer escaping from the valve and the Lid opens freely with minimal force. Only then is it safe to remove the Lid and serve food. … If it does not open easily this means that the Multi-Cooker is still under pressure." (*id.* at p. 19); (g) representing that "There is a safety feature to keep Lid from being removed while the Multi-Cooker is under pressure." (*id.* at p. 35); and (h) omitting warnings that certain foods that can clog the pressure release valves should not be cooked in the pressure cooker, otherwise a dangerous pressurization can develop within the pot and potentially, cause contents to spray out on the consumer, that pressure can remain in the Pressure Cooker and the Lid's safety lock mechanism may not work, resulting in a dangerous condition if the consumer lifts the Lid, and that pressure can build in the pot even if the Lid is not on securely, resulting in a dangerous condition that can also cause hot contents to spray out of the pot. *See* Exhibit 1, Defendants' Owner's Manual. These misrepresentations originated, at least in part, from Sunbeam's headquarters in Florida.

*Id.* ¶¶ 319.

Finally, with respect to the fourth prong, the Plaintiffs specifically allege that they "would not have purchased the Product or would have sought substantially different terms . . . [had they known] of the Defects and/or that the Product was unfit to perform its ordinary and intended purpose." *Id.*

¶¶ 30–36. They claim, in other words, that, "as a consequence of the fraud," *FindWhat Inv'r Grp.*, 658 F.3d at 1296, the Defendants induced the Plaintiffs to buy the Pressure Cookers, *see, e.g.,* Complaint ¶ 326 ("As a direct and proximate cause of the violation of the FDUTPA, described herein, Plaintiffs and Class Members have been injured in that they own and/or use Pressure Cookers with the defects based on misrepresentations and nondisclosure of the material facts alleged herein, including but not limited to, nondisclosure of the defects[.]"); *see also id.* ¶ 33 ("Ms. Griffin purchased the Pressure Cooker (Model Number SCCPPC600-V1-BF) in or around early 2019 in Georgia. Ms. Griffin reviewed the packaging of the Pressure Cooker prior to purchase and relied upon the representations thereon in making her decision to purchase the Pressure Cooker."); *id.* ¶ 34 ("Ms. Brown purchased a Crock-Pot 6-qt. Express Crock Pressure Cooker on or about June 14, 2018 online from Kohl's and picked it up in a Kohl's store in Washington."); *id.* ¶ 35 ("Ms. Casey reviewed materials surrounding the Pressure Cooker, including its packaging, and Defendants' claims about its safety prior to purchasing the Product, and relied upon those representations in making her decision to purchase and use the Pressure Cooker."); *id.* ¶ 36 ("Ms. Naegele reviewed the packaging of the Pressure Cooker prior to purchase, including the representations that the Product's lid locking mechanism can be "trusted," and relied upon the representations thereon in making her decision to purchase the Pressure Cooker.").

That's quite a lot of detail about the "who, what, when, where, and how of the allegedly false statements." *Carter*, 2021 WL 1165248, at *17 (cleaned up)). These allegations, in sum, plainly satisfy Rule 9(b)'s heightened pleading standard—so we reject the Defendants' Rule 9 contentions.[20]

---

[20]     Two more points on this. *One*, the Defendants concede that the GFBPA has a "less rigorous pleading standard" than Rule 9(b) does. MTD at 15. But they still argue that, "[w]hen the alleged violation is a misrepresentation, proof of causation requires a showing of justifiable or reasonable reliance. In other words, the plaintiff carries the burden of establishing that the injury was a result of the plaintiff's reasonable reliance upon the alleged misrepresentation." *Id.* at 14–15 (cleaned up). And

## 2.      Knowledge

Nor are the Defendants right to insist that, for their FDUTPA and ICFA claims, the Plaintiffs failed to allege that the Defendants *knew* about the defects. *See* MTD at 16 ("To state a claim under the FDUPTA and ICFA, Plaintiffs also must plead facts plausibly establishing that Sunbeam knew of the alleged 'defects' at the time they purchased the subject Express Crocks." (citing *Matthews v. Am. Honda Motor. Co.*, 2012 WL 2520675, at *3 (S.D. Fla. June 6, 2012) (Williams, J.))). As a preliminary matter, FDUTPA plainly doesn't require plaintiffs to plead knowledge. *See, e.g.*, *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985–86 (11th Cir. 2016) ("[U]nder FDUTPA, the plaintiff must only establish three objective elements: (1) a deceptive act *or unfair practice*; (2) causation; and (3) actual damages." (citing *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2007) (emphasis added))).[21] And, while

_____

they maintain that Griffin hasn't suffered any such injury. *See id.* at 15. The Defendants are thus right about Georgia law. *See Raysoni v. Payless Auto Deals, LLC*, 296 Ga. 156, 156 n.2 (Ga. 2014) (explaining that "proof of causation [under the GFBPA] requires a showing of reasonable reliance" (cleaned up)). But they're wrong about our facts: Griffin *has* alleged reliance. *See* Complaint ¶ 33 ("Ms. Griffin reviewed the packaging of the Pressure Cooker prior to purchase and relied upon the representations thereon in making her decision to purchase the Pressure Cooker. Ms. Griffin also read the Product's Owner's Guide prior to her using the Product. Ms. Griffin believed the Product was fit for use as a pressure cooker. Plaintiff Griffin would not have purchased the Product if she had known of the Defects or that the Product was unfit to perform its intended purpose, rendering the Product useless."); *id* ¶ 351 ("As a result of Defendants' violations, Plaintiff Griffin and members of the Georgia Subclass have suffered damages because they paid for Products, which they would not have purchased, or would not have paid as much for the Products, had they known the truth about the Product.").

*Two*, the Defendants cite *Smith v. Globe Life Insurance Co.*, 460 Mich. 446, 465 (Mich. 1999), for the proposition that the "Plaintiffs' MCPA claims also fail because the MCPA does not apply to transactions that were authorized by federal and state law." MTD at 13 n.8. We disagree. In *Smith*, the Michigan Supreme Court held that, "when the Legislature said that transactions or conduct specifically authorized by law are exempt from the MCPA, it intended to include conduct the legality of which is in dispute." *Ibid.* (cleaned up). But the Defendants have failed to show that the Michigan legislature has exempted deceptive pressure-cooker sales from the MCPA's sweep. Nor do they explain why the U.S. CPSC's regulation of pressure-cooker sales might have any effect on the MCPA's application to the Defendants' (allegedly) fraudulent—or, if not fraudulent, at least unlawful—sale of defective pressure cookers.

[21] The Defendants' reliance on Judge Williams's decision in *Matthews* is misplaced. In that case, it's true, Judge Williams observed: "Florida courts have recognized that a FDUTPA claim is stated where

49

we agree that ICFA could be construed as requiring an intentional *and* deceptive act[22]—which, for all practical purposes, functions as knowledge—the Plaintiffs have sufficiently alleged that the Defendants *knew* about the defects.

After all, the Complaint avers that the UL's warned the Defendants about the defects as early as May 2017, *see* Complaint ¶ 5, and that the Defendants began receiving consumer complaints about the defects beginning on December 26, 2017, *id.* ¶¶ 12, 104. The Complaint also points out that, on February 27, 2018, the Defendants' retained expert (Exponent) prepared a "root cause" report, which "informed Defendants that the lid locking mechanism was insufficient to keep the lid locked when internal pressure remained in the pot and the consumer used only "a moderate amount of force" to open the lid." *Id.* ¶ 93. The Complaint adds that the Defendants then conducted several tests—in which they compared their Product's locking mechanism to the locking mechanisms of other similar products—and found their own Pressure Cookers inadequate. *See id.* ¶¶ 92–99. At this stage of the case, we must accept these allegations as true. *See Sherry Frontenac, Inc. v. United States*, 868 F.2d 420, 421 (11th Cir. 1989) ("The material allegations of the complaint are taken as true, and are liberally

---

the defendant *knowingly* fails to disclose a material defect that diminishes a product's value." *Matthews*, 2012 WL 2520675, at *3 (emphasis added) (citing *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. 1st DCA 2000)). But *Davis* said no such thing. It held only that "a deceptive practice [under FDUTPA] is one that is *likely to mislead* consumers." *Davis*, 776 So. 2d at 974 (emphasis added & cleaned up). In fact, *Davis* explained that a plaintiff "need *not* prove the elements of fraud to sustain an action under the statute." *Ibid.* (emphasis added & cleaned up); *see also Democratic Rep. of the Congo v. Air Capital Grp., LLC*, 614 F. App'x 460, 470 (11th Cir. 2015) ("A FDUTPA claim, unlike a claim for fraud, requires proof that defendant's act would likely mislead the objective consumer acting reasonably in the circumstances." (cleaned up)). And knowledge is, of course, a central element of a fraud claim. *See Lopez-Infante v. Union Cent. Life Ins. Co.*, 809 So. 2d 13, 15 (Fla. 3d DCA 2002) ("The essential elements of a fraud claim are: (1) a false statement concerning a specific material fact; (2) the maker's *knowledge* that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation." (emphasis added)).
[22] *See Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 72 (Ill. 2007) ("To adequately plead a private cause of action for a violation of [the ICFA], a plaintiff must allege: (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff, (5) proximately caused by the deception." (cleaned up)).

construed in plaintiff's favor."). Given these detailed allegations that the Defendants continued selling their Pressure Cookers long *after* receiving detailed warnings about their Product's defects, we think the Plaintiffs have plausibly averred that the Defendants knew about those defects.

### 3.     Rife's Claims

We come out the other way, though, on Rife's claims, because she doesn't (and cannot) allege that she's suffered any actual damages under FDUTPA. As we've mentioned, "[t]he three elements of a consumer claim under FDUTPA are: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1097 (11th Cir. 2021) (cleaned up)). "Actual damages under FDUTPA are measured according to the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Id.* at 1098. The only exception to this computation "may exist when the product is rendered valueless as a result of the defect—then the purchase price is the appropriate measure of actual damages." *Congo*, 614 F. App'x at 472 (quoting *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. 3d DCA 1984)). In any event, "FDUTPA does not provide for the recovery of nominal damages, speculative losses, or compensation for subjective feelings of disappointment." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 873 (Fla. 2d DCA 2006) (cleaned up). And "members of [a] putative class who experience no actual loss have no claim for damages under FDUTPA." *Ibid.* (cleaned up).

Rife never alleges that she bought the Pressure Cooker. Nor could she; she received it as a gift. *See* Complaint ¶ 30 ("In December 2017, Ms. Rife received the new Pressure Cooker . . . as a present from her daughter, Plaintiff Nicolle Kainrath, as Ms. Rife instructed her to do."). And, as we just explained, "there are only two possible ways to measure actual damages in a FDUTPA claim: (1) the value between what was promised and what was delivered; or (2) the total price paid for a valueless good or service." *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 302 F. Supp. 3d 1319, 1323 (M.D.

Fla. 2016) (Byron, J.). In either case, a plaintiff must have *bought* the product—and Rife *concedes* that she didn't. *See* MTD Response at 18 ("Given Kainrath purchased the defective product . . . .").

And we reject the two arguments the Plaintiffs offer in support of Rife's FDUTPA claim. In the *first*, they say that "Rife had the right to return the Product and receive a refund from Defendants." MTD Response at 18. But they cite no law for the proposition that this right-to-return matters. *See Hamilton*, 680 F.3d at 1319 ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it."). And that's probably because the argument fails on its own terms. Remember that a FDUTPA plaintiff can recover only the benefit of her bargain. But Rife never bargained with anyone—or for anything. Her right to return the Product, then, if that right exists at all, doesn't entitle her to the benefit of a bargain she never struck.

The Plaintiffs contend, *second*, that, because "Rife (the gift recipient) would not have used or accepted the Product, but rather would have returned it, had she known the truth," she, too, has the right "to pursue actual damages for what it would cost to purchase a non-defective equivalent Product." MTD Response at 19. Again, the Plaintiffs cite no Florida cases—and, indeed, no cases anywhere interpreting FDUTPA—for this convoluted (and implausible) theory. That's probably grounds enough to disregard it. *Cf. Hamilton*, 680 F.3d at 1319. Rather than cite a Florida case, the Plaintiffs refer to a District of New Jersey decision in which the court certified a settlement for a "class consist[ing] of consumers who purchased or received as a gift the same product[.]" *In re Phillips/Magnavox TV Litig.*, 2012 WL 1677244, at *2 (D.N.J. May 14, 2012) ("All Class Members were required to submit a timely claim and provide proof that they purchased a new Philips plasma TV or received one as a gift."). But the parties in that case had *agreed* to the settlement, which the court simply approved. The defendants there thus did not—as they do here—ask the court to *dismiss* the plaintiffs' claims. What's worse, that case was brought under a totally different legal regime and didn't have anything to do with FDUTPA. *Phillips*, in short, is neither here nor there.

We, in sum, **DENY in part** the MTD as it relates to the Purchasing Plaintiffs' consumer-protection claims and **GRANT in part** the MTD as to Rife's FDUTPA claim.

### F.       Unjust Enrichment (Count V)

We conclude with the Plaintiffs' *first* unjust-enrichment claim (Count V).[23] "The elements of a cause of action for [unjust enrichment] are that: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it." *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co., Inc.*, 695 So. 2d 383, 386 (Fla. 4th DCA 1997); *see also Challenge Air Transp., Inc. v. Transportes Aereos Nacionales, S.A.*, 520 So. 2d 323, 324 (Fla. 3d DCA 1988) ("The essential elements of an action for unjust enrichment are a benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention of such benefit by the defendant under such circumstances that it would be inequitable for him to retain it without paying the value thereof." (cleaned up)).

But "[t]he theory of unjust enrichment is equitable in nature and is, therefore, not available where there is an adequate legal remedy. It follows that a party may not maintain an action for unjust enrichment if the damages sought are covered by an express contract." *David v. Am. Suzuki Motor Corp.*, 629 F. Supp. 2d 1309, 1324 (S.D. Fla. 2009) (Gold, J.) (cleaned up); *see also Koski v. Carrier Corp.*, 347 F. Supp. 3d 1185, 1195 (S.D. Fla. 2017) (Scola, J.) ("Under Florida law, unjust enrichment is an equitable remedy which necessarily fails upon a showing that an express contract exists." (quoting *Alvarez v. Royal Caribbean Cruises, Ltd.*, 905 F. Supp. 2d 1334, 1341 (S.D. Fla. 2012) (Moreno, J.)). In other words, "an unjust enrichment claim can only be pled in the alternative if one or more parties

---

[23] As we've said, the Defendants didn't move to dismiss Count XVII (the *second* unjust-enrichment claim)—so that claim will proceed.

contest the *existence* of an express contract governing the subject of the dispute[.]" *Zarrella v. Pac. Life Ins. Co.*, 755 F. Supp. 2d 1218, 1227 (S.D. Fla. 2010) (Cohn, J.) (emphasis added & cleaned up); *see also Licul v. Volkswagen Grp. of Am., Inc.*, 2013 WL 6328734, at * 8 (S.D. Fla. Dec. 5, 2013) (Cohn, J.) ("Unjust enrichment is an equitable cause of action that is unavailable where the underlying wrongs are properly addressed by a legal remedy. A plaintiff may plead unjust enrichment as an alternative theory to a legal cause of action. However, where the unjust enrichment claim relies upon the same factual predicates as a plaintiff's legal causes of action, it is not a true alternative theory of relief but rather is duplicative of those legal causes of action." (cleaned up)); *Williams v. Johnson*, 232 So. 3d 483, 484 (Fla. 3d DCA 2017) ("Appellants sought damages on a theory of unjust enrichment. However, given the existence of an express contract covering the same subject matter, claims arising out of that contractual relationship will not support a claim for unjust enrichment." (cleaned up)).

Our Defendants attack the Plaintiffs' express-warranty claim in several ways. They, for instance, contend that the Written Express Warranty doesn't cover the alleged defects, that it wasn't breached, and that it unambiguously disclaimed the damages the Plaintiffs are asking for. *See* MTD at 8–10. But they *never* dispute the incontestable fact that the Written Express Warranty *exists. See generally* MTD. And that's a problem because the Plaintiffs' unjust-enrichment claim in Count V "cover[s] the same subject matter" as the Written Express Warranty—which is to say it "arise[s] out of that contractual relationship" that was forged by the Plaintiffs' purchases of the Defendants' Pressure Cookers. *Williams*, 232 So. 3d at 484; *see also* Complaint ¶ 293 ("By their wrongful acts and omissions described herein, including selling the defective Pressure Cooker, Defendants were unjustly enriched at the expense of Plaintiff Kainrath, Griffin, Brown, Casey, and Naegele, and Class members."); *id.* ¶ 295 ("It would be inequitable for Defendants to retain the profits, benefits, and other compensation obtained from their wrongful conduct as described herein in connection with selling the Pressure Cooker."). These allegations, of course, mirror the assertions the Purchasing Plaintiffs advanced in

54

their express-warranty claim. *See id.* ¶ 250 ("Defendants expressly warranted in writing that they would repair or replace any defect in the Pressure Cooker, or refund the purchase price of the Pressure Cooker if repair or replacement is not feasible."). And the Plaintiffs (notably) never claim that they lack an adequate remedy at law. *See generally* Complaint; *see also Nautica Int'l, Inc. v. Intermarine USA, L.P.*, 5 F. Supp. 2d 1333, 1342 (S.D. Fla. 1998) (Gold, J.) ("But more importantly, Nautica fails to allege that its contractual remedy is inadequate. Therefore, Nautica has failed to state a claim for unjust enrichment.").

We therefore **GRANT** the MTD as to Count V.

\*\*\*

After careful review—and for the reasons outlined in this Order—we hereby **ORDER AND ADJUDGE** that the Defendants' Motion to Dismiss [ECF No. 125] is **GRANTED in part** and **DENIED in part** as follows:

1. The MTD is **GRANTED** as to:

   a. The Plaintiffs' claim for Breach of Express and Implied Warranties under the Magnuson-Moss Warranty Act (on behalf of Plaintiffs and the Class)—Count I—as to that part of the claim that's based on an implied warranty;

   b. The Plaintiffs' claim for Breach of Implied Warranty of Merchantability (on behalf of Plaintiffs and the Class)—Count III;

   c. The Plaintiffs' claim for Unjust Enrichment (on behalf of Plaintiffs and the Class)—Count V;

   d. The Plaintiffs' class claims for Negligence and for Strict Product Liability (Manufacturing and Design Defects and Failure to Warn)—as pled in Counts IV and VI—to the extent they're brought by Plaintiffs Nicolle Kainrath, Mitzi Griffin, Heather Brown, Lorrayne Casey, and Kelly Naegele for economic losses;

   e. The Plaintiffs' consumer-protection claims, as pled in Counts VII–XI, to the extent they're brought by Plaintiff Kimberly Rife; and

   f. The Plaintiffs' claim for Injunctive and Declaratory Relief (on behalf of Plaintiffs and the Class)—Count XII—to the extent the claim seeks injunctive relief;

2. The MTD is **DENIED** as to:

    a. The Plaintiffs' claim for Breach of Express and Implied Warranties under the Magnuson-Moss Warranty Act (on behalf of Plaintiffs and the Class)—Count I—as to that part of the claim that's based on an express warranty;

    b. The Plaintiffs' claim for Breach of Express Warranty (on behalf of Plaintiffs and the Class)—Count II;

    c. The Plaintiffs' class claims for Negligence and for Strict Product Liability (Manufacturing and Design Defects and Failure to Warn)—as pled in Counts IV and VI—to the extent they're brought by Plaintiff Mitzi Griffin for other property damage;

    d. The Plaintiffs' consumer-protection claims, as pled in Counts VII–XI, to the extent they're brought by all Plaintiffs other than Rife;

3. Furthermore, Counts XII (as to declaratory relief), Count XIV (Negligence – on behalf of Kimberly Rife), Count XVI (Products/Strict Liability – on behalf of Kimberly Rife), and Count XVII (Unjust Enrichment – on behalf of Plaintiffs and the Class) are unchallenged and shall proceed.

**DONE AND ORDERED** in the Southern District of Florida, this 30th day of September 2022.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record